**RAWLINGS SPORTING GOODS COMPANY, INC., Appellant,**

v.

**Mark DANIELS, Appellee.**

**No. 6257.**

Court of Civil Appeals of Texas, at Waco.

June 30, 1981.

Rehearing Denied Aug. 13, 1981.

William Mac Gann, Gann, Fried & Edwards, William E. Matthews, Sewell & Riggs, Houston, John L. Hauer, Akin, Gump, Hauer & Feld, Dallas, for appellant.

Bryan Russ, Palmos & Russ, Hearne, Robert E. Ballard and W. James Kronzer, Kronzer, Abraham, Watkins, Nichols, Ballard & Friend, Houston, Matt Dawson, Waco, for appellee.

## OPINION

McDONALD, Chief Justice.

This is an appeal by defendant Rawlings from $1,500,000 judgment against it in favor of plaintiff Daniels in a products liability and negligence case.

Plaintiff Daniels sued defendant Rawlings alleging plaintiff sustained injuries on August 20, 1974 during football practice; that plaintiff was wearing a Rawlings helmet when he was in collision with another player; that the helmet rather than deflecting the blow and absorbing the shock, caved in, causing massive head and brain injuries to plaintiff; that the helmet as manufactured by defendant was defective; and exposed plaintiff to an unreasonable risk of harm. Plaintiff further alleged defendant was negligent in failing to warn of the protective limitations of the helmet, which was a proximate cause of plaintiff's injuries. Plaintiff sought damages of $750,000. Plaintiff additionally alleged defendant was grossly negligent in failing to warn users and the public of the limitations on the protective capabilities of its helmet, for which he sought exemplary damages.

Trial was to a jury which found:

1) The injury to plaintiff resulting in subdural hematoma occurred August 20, 1974.

2) At the time plaintiff received the injury he was wearing a helmet manufactured by defendant.

3) The helmet as manufactured by defendant was defectively manufactured.

4) Such defective condition was a producing cause of plaintiff's injuries.

5) The failure of defendant to warn that the helmet would not protect against subdural hematomas exposed plaintiff to an unreasonable risk of harm.

6) The failure of defendant to warn that the helmet would not protect against subdural hematomas was a producing cause of plaintiff's injuries.

7) The failure of defendant to warn that the helmet would not protect against subdural hematomas was negligence.

8) Such negligence was a proximate cause of the event in question.

9) The failure of defendant to warn that the helmet would not protect against subdural hematomas was gross negligence.

10) Fixed plaintiff's damage at $750,000.

11) Fixed exemplary damage at $750,000.

The trial court rendered judgment for plaintiff on the verdict for $1,500,000.

Defendant appeals on 12 points.

Plaintiff was quarterback on the Franklin High School football team. On August 20, 1974, while participating in team practice, he was involved in a "head to head" collision with a teammate. The collision caused an indentation in plaintiff's helmet. Plaintiff turned the helmet into the coach and continued with practice. The next day, August 21, plaintiff returned to practice. While participating in such practice he passed out. He was taken to a Bryan hospital, and then to a Houston hospital, where his condition was diagnosed as a subdural hematoma. After the subdural hematoma had been surgically evacuated he returned to school on September 14, 1974. Plaintiff's injury resulted in severe permanent brain damage drastically reducing his abilities.

■ Point 1 asserts that Finding 2 is against the great weight and overwhelming preponderance of the evidence. Finding 2 found the helmet plaintiff was wearing was a helmet manufactured by defendant.

The school owned 4 to 6 helmets manufactured by defendant; 15 to 18 McGregor helmets; and 15 to 20 B & B helmets. Some of the helmets had been reconditioned by a company in San Antonio. The McGregors, purchased in 1973, were the newest. Players who lettered were allowed first choice in selecting their helmets, and generally selected the newer McGregors. Plaintiff had lettered in 1973 and had worn a McGregor helmet in 1973. Once a letterman chose a helmet he usually kept it throughout the remainder of his playing career. After the accident on August 20, plaintiff turned his helmet into the coach who placed it in his office where it re-

mained for about a year and then disappeared.

Coach Hedrick testified he had only seen one dented helmet in his experience; that it was his recollection that the helmet brought to his office was a Rawlings HC20 Helmet; that "there is [no] question in [his] mind but what the helmet that was dented and kept in his office was a Rawlings helmet".

We think the evidence ample to sustain Finding 2, and that such finding is not against the great weight and preponderance of the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660.

▮ Points 2 through 6 assert there is no evidence to support Findings 3 and 4, and that such findings are against the great weight and overwhelming preponderance of the evidence.

Finding 3 found the helmet defectively manufactured; and Finding 4 found such defective condition was a producing cause of plaintiff's injuries.

Defendant asserts there is no finding or evidence that the helmet was defective at the time it left the hands of Rawlings, and that plaintiff has failed to trace the defect to the manufacturer's hands.

The helmet worn by plaintiff was manufactured by defendant. Franklin High School purchased the helmet between 1967 and 1969. Defendant puts no limit of years or use limit on its helmets. There is evidence that some helmets owned by the school had been sent to a firm in San Antonio for reconditioning, but such evidence is at best a scintilla. The coach who testified to the foregoing did not remember whether such occurred before August 1974 or later (trial was in April 1980). And he further testified that helmets sent for reconditioning were returned with "Alamo Athletic" stamped upon them. There is no evidence that the helmet worn by plaintiff was so stamped. Another coach testified that some helmets had been sent to Alamo for reconditioning, but he did not recall whether any were sent between 1967 and 1974 or not. Plaintiff was wearing the helmet manufactured by defendant when he had

the head to head collision. The helmet indented inward some 1½ to 2 inches. There is evidence that if a helmet receives a blow and doesn't deflect it, but instead indents in, that the helmet was defective; and defendant's own witnesses testified that if a helmet indented an inch and a half and came in contact with the wearer's skull that considerable force was transmitted to and focused on the wearer's skull at that point.

There is other evidence that the indenting of the helmet on collision does not reflect defective manufacture.

All the evidence is that the purpose of the helmet was to protect the wearer's head from injury. There is evidence that if a football helmet indents it is not performing its function, that it is "defective headgear". Another witness, a professional athletic trainer testified: "I don't want a football helmet that is going to cave in" and "I don't want it to give at all".

Dr. Moiel who performed the surgery on plaintiff, testified that skull contact by the plastic portions of the helmet can cause a brain injury such as suffered by plaintiff; that plaintiff had a large blood clot over the left side of the brain; that plaintiff "had obviously had a bruise to his head and to his brain which resulted in several things; first becoming unconscious due to a concussion, bruising the right side of the brain, which reflected the EEG abnormalities on the right and then, developed a blood clot on the opposite side of the brain, the left side, all as a result of the same accident or injury * * *". And Dr. Omaaya, a witness for defendant, testified that a collision of two football players sufficient to cause the indentation of the helmet of one and a half inches over the right temporal area would be sufficient to cause a subdural hematoma, and that this was true even if the contact was not sufficient to bruise the skull.

It is our view there is ample evidence from which the jury could conclude that the indented helmet was defective because it failed to perform its intended purpose, to protect the wearer from head injuries, and that Finding 3 is not against the great weight and preponderance of the evidence.

It is our further view that the evidence is ample to sustain Finding 4, that such defective condition was a producing cause of plaintiff's injury; and that Finding 4 is not against the great weight and preponderance of the evidence, *In re King's Estate*, supra.

Points 7 through 10 assert: 1) The trial court erred in submitting Issues 5 and 7 because defendant had no duty to warn that its helmet would not protect against subdural hematomas; 2) there is no evidence to support Findings 5, 6, 7 and 8; and 3) such findings are against the great weight and preponderance of the evidence.

Issue 5 found the failure of defendant to warn that its helmet would not protect against subdural hematomas exposed plaintiff to an unreasonable risk of harm; Issue 6 found the failure to warn was a producing cause of plaintiff's injury; Issues 7 and 8 found the failure to warn was negligence and a proximate cause of the plaintiff's injury.

All the evidence is that the primary purpose of a football helmet is to protect against "head" or "brain" injuries of the wearer of the helmet. Defendant has known for a long time that a helmet will not protect against brain injury and against subdural hematoma; that almost all fatal football injuries result from head and neck injuries; and that when a person uses a football helmet for its intended purpose of protecting the head while playing football, that there is still a significant risk of brain injury. In spite of this knowledge defendant made an election, a conscious decision, not to warn users that the helmet would not protect the brain from this type of injury.

█ Every manufacturer has a duty to warn of dangers in the use of its product of which it knows or should know. *Crocker v. Winthrop Lab., Div. of Sterling Drug, Inc.*, Tex., 514 S.W.2d 429; *Bristol-Myers Co. v. Gonzales*, Tex., 561 S.W.2d 801; *Technical Chemical Co. v. Jacobs*, Tex., 480 S.W.2d 602; *Air Shields, Inc. v. Spears*, Tex.Civ. App. (Waco) NRE, 590 S.W.2d 574.

█ We think defendant had a duty to warn that its helmet would not protect against head and brain injuries.

█ Where there is no warning, as here, the presumption is that the user would have read an adequate warning. *Technical Chemical Co. v. Jacobs*, supra. And plaintiff's father affirmatively testified he would not have consented to plaintiff's playing had he been aware the helmet would not have protected against brain injury.

█ The danger to plaintiff was not inherent in the helmet, but in the use of the helmet. We think liability arises when a product is manufactured and marketed for protection of the consumer, the consumer buys the product, relying on it for his protection, while engaged in a generally dangerous activity, the manufacturer fails to warn of known limitations in the protective abilities of its product with which the user is not equally familiar, and as a result, the consumer is injured while using the product.

█ The rationale supporting a duty to warn is clear. The consumer is encouraged to participate in dangerous activity because of his confidence in the protective ability of the product. The manufacturer on the other hand, has superior knowledge of the limitations of the product. Where it is foreseeable that a consumer will rely on the product, thus exposing himself to a risk he might have avoided had he known the limitations, there is a duty to warn. Here the failure to warn was negligence. A product that does not include a warning is dangerously defective. In the instant case the jury was authorized to believe that a proximate cause of plaintiff's injury was the absence of a warning of the limitations of his helmet sufficient to prevent his reliance upon its protective capacities. The evidence is ample to sustain Findings 5, 6, 7 and 8, and such findings are not against the great weight and preponderance of the evidence. *In re King's Estate*, supra.

█ Points 11 and 12 assert there is no evidence of gross negligence, and that Find-

ings 9 and 11 are against the great weight and preponderance of the evidence.

Issue 9 found that defendant's failure to warn that the helmet would not protect against subdural hematomas was gross negligence; and Issue 11 awarded $750,000 exemplary damages.

Defendant admitted that it never made any attempt to warn potential users of the limitations of its helmets; that it had known for a long time that the helmets will not protect against brain injuries; that it made the "conscious decision" not to tell people the helmet would not protect against subdural hematomas; that the company "elected" not to warn that the helmets would not protect against head injuries, in spite of the knowledge that laymen believe that the purpose of the helmet is to protect the head. A witness for defendant testified that 30 to 40 deaths occur each year from subdural hematomas received in football; that parents do not have this detailed knowledge, and that "it is the responsibility of the manufacturer to explain that".

Defendant asserts that it exercised care in manufacturing the helmet; but there is no evidence of any care whatsoever being exercised in the matter of failure to warn of the helmet's limitation.

The trial court defined gross negligence: "Gross negligence means the entire want of care which would raise a belief that the act or omission complained of was the result of conscious indifference to the rights or welfare of persons to be affected by it".

Our Supreme Court in *Burk Royalty Co., et al. v. Sally K. Walls, Ind. A/N/F and Natural Gdn. of Jeffrey Paul Walls, Jr.*, 596 S.W.2d 932, in its latest expression addressing the question of gross negligence, and after an exhaustive review of its history states:

"The essence of gross negligence is not the neglect which must, of course, exist. What lifts *ordinary* negligence into *Gross* negligence is the mental attitude of the defendant; that is what justifies the penal nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i. e., knowingly, indifferent to his rights, welfare and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care. Such conduct can be active or passive in nature. * * *

"In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look to all of the surrounding facts, circumstances, and conditions, not just individual elements or facts. * * * A mental state may be inferred from actions. All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is some evidence of gross negligence.

"In making this determination, all evidence must be considered in a light most favorable to the party in whose favor the verdict has been rendered and every reasonable inference deducible from the evidence is to be indulged in such party's favor".

See also: *Atlas Chemical Industries v. Anderson*, Tex., 524 S.W.2d 681; *John W. Kraus, et al. v. Alamo Nat. Bank, et al.*, Tex.Civ.App., 586 S.W.2d 202; *Sheffield Div., Armco Steel Corp. v. Jones*, Tex., 376 S.W.2d 825.

In the instant case, defendant fully understood the dangers which were incidental to the use of its helmets. Testimony of defendant's own witnesses revealed defendant knew: 1) A practical helmet could not be designed that would prevent all head injuries; 2) there are limitations on the protection capabilities of any helmet; 3) it has been known for a long time that helmets will not protect against all brain injuries; 4) defendant's helmets would not protect against all subdural hematomas; 5) laymen believe the purpose of the helmet is to protect the head; 6) almost all fatal football injuries are related to head and neck injuries; 7) 200,000 to 4 million football players are injured each year; 8) you can receive a brain injury while in a helmet that performs all the functions that it was

designed to perform; 9) the helmet has severe limitations on protecting the brain; it will not protect against subdural hematomas; 10) total football deaths are between 30 and 40 a year from subdural hematoma; 11) parents of high school players don't have this detailed knowledge of the dangers of subdural hematoma.

There is evidence that since 1960 almost all fatal injuries from playing football have been as a result of head or neck injuries; that in spite of the helmets being worn, the injury sustained by plaintiff, subdural hematoma, can occur, and that the foregoing was well known to defendant.

In spite of all the facts known to defendant, it made a conscious business decision not to warn of this grave danger.

Viewing all the circumstances in this case, and the entire record, we think the jury authorized to find defendant grossly negligent in answering Issues 9 and 11 as they did. We think the evidence ample to sustain such findings, and that they are not against the great weight and preponderance of the evidence. *In re King's Estate*, Tex., supra.

All defendant's points and contentions have been considered and are overruled.

AFFIRMED.