**AMERICAN HOME ASSURANCE COMPANY, et al., Appellants,**

v.

**SAFWAY STEEL PRODUCTS COMPANY, INC., A DIVISION OF FIGGIE INTERNATIONAL, INC., et al., Appellees.**

No. 3–86–077–CV.

Court of Appeals of Texas, Austin.

Dec. 9, 1987.

Rehearing Denied Feb. 3, 1988.

Steven M. Tipton, Flahive, Ogden & Latson, Austin, for appellants.

Dean M. Kilgore, Diana K. Borden, McGinnis, Lochridge & Kilgore, Austin, for appellees.

Before POWERS, GAMMAGE and CARROLL, JJ.

CARROLL, Justice.

Appellants, American Home Assurance and National Union Fire Insurance, appeal from a declaratory judgment in favor of appellees, Rawlings Sporting Goods and Safway Steel Products, concerning insurance coverage of punitive damage awards. The litigation follows two separate product liability actions in which Texas juries had assessed punitive damages.

The issues in this appeal fall broadly into three principal categories: (1) conflicts of law; (2) construction of the language of the insurance agreements in question; and (3) the insurability of punitive damage awards as a matter of public policy.

We have concluded that any conflict of law question must be resolved in favor of applying Texas law, that the plain language of the policies does not exclude punitive damages, and that insuring against possible punitive damages is not contrary to Texas public policy. Accordingly, we affirm the trial court's judgment.

## I. BACKGROUND

A. *Rawlings Case:* In 1973, Rawlings Sporting Goods Company, Inc., purchased an Umbrella Liability Policy from American Home Assurance. While the policy was in effect, Mark Daniels sustained injuries while playing football and wearing a Rawlings football helmet. Mark sued, and the jury found Rawlings grossly negligent in failing to warn its customers of the limitations of the helmet, and awarded $750,000 in punitive damages. *Rawlings Sporting Goods Co., Inc. v. Daniels,* 619 S.W.2d 435 (Tex.Civ.App.1981, writ ref'd n.r.e.).

American Home paid the claim but reserved for future resolution the issue of whether it was legally obligated to pay the *punitive damage* portion of the judgment. The policy provides in part:

### Insuring Agreements

Coverage—To pay on behalf of the insured the ultimate net loss in excess of the retained limit herein defined, which the insured shall become legally obligat-ed to pay as damages by reason of the liability imposed upon the insured by law, or assumed by the insured under contract because of—

(a) Personal injury, including death at any time resulting therefrom, as defined herein and caused by or arising out of an occurrence.

\*　　\*　　\*　　\*　　\*　　\*

### Definitions

\*　　\*　　\*　　\*　　\*　　\*

Occurrence—With respect to Personal Injury ... the term "occurrence" means an event ... which result(s) in Personal Injury ... neither expected nor intended from the standpoint of the insured ...

Ultimate Net Loss— ... the term "Ultimate Net Loss" shall mean the total sum which the insured or any company as its insurer, or both become obligated to pay by reason of personal injury ...

B. *Safway Case:* In 1977, National Union Fire Insurance Company, Inc. issued an Excess Third Party Liability Policy to Safway Steel Products Company, Inc. During the policy period, Leo Ventris successfully sued Safway for injuries caused by a defective scaffold. Ventris charged gross negligence in design, testing, marketing, warning or failure to warn of the dangers of the scaffolding system, and recovered $1,000,000 in punitive damages.

The case settled while under submission on appeal and National Union Fire paid its portion of the settlement, but reserved for future resolution the issue of whether it was obligated to pay that part of the settlement attributable to punitive damages. The pertinent provisions of the Safway policy are as follows:

### Insuring Agreement

In consideration of the payment of premium stated in the Declarations, the Company agrees to indemnify the insured in accordance with the applicable insuring agreements of the Primary Insurance, against loss subject to the limits stated in Item 6, Section I of the Declarations and as fully and to all intents and purposes

as though the Primary Insurance had been issued forth in Item 6 ...

\* \* \* \* \* \*

### Conditions

1. It is agreed that this policy, except as herein stated, is subject to all conditions, agreements and limitations of and shall follow the Primary Insurance in all respects ...

Safway's primary insurance carrier at the time was United National Insurance Company, and the pertinent contractual provisions are as follows:

### Coverage—Bodily Injury Liability

The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury ... to which this insurance applies, caused by an occurrence ...

\* \* \* \* \* \*

### Definitions

"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

Since both the Rawlings and Safway cases involve similar questions, they were consolidated into a single declaratory judgment action.

## II. CONFLICTS OF LAW

■ As a preliminary matter, appellants contend that the district court erred in applying Texas law both to the construction of the insuring agreements, and to the issue of whether public policy prohibits the insurability of punitive damage awards. Appellants suggest that New York or Missouri law should have been applied in the Rawlings case and New York or Wisconsin law applied in the Safway case. This argument is primarily based upon § 188 of the Restatement (Second) of Conflict of Laws which addresses the evaluation of the significance of a state's relationship to a particular question.[1]

Applying the § 188 analysis to the record of this appeal, we find the following contacts:

A. *The Rawlings Case:* American Home is a New York Corporation with its principal place of business in New York; Rawlings' principal place of business is Missouri; the umbrella liability policy was negotiated by phone with Rawlings' office in Missouri; the policy was issued in New York and countersigned in Missouri; the premiums are payable in New York through Rawlings' agent in Ohio; and the last act of affirmance by the insurer occurred in New York.

B. *The Safway Case:* National Union Fire's state of incorporation is Pennsylvania; National Union Fire's home office and principal place of business is New York; Safway's principal place of business is Wisconsin; the policy premiums are payable in New York; and the last act of affirmance by the insurer occurred in New York.

In *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984), the Supreme Court abandoned the traditional *lex loci* rule for

---

1. § 188. Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties *with respect to an issue in contract* are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), *the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:*

  (a) the place of contracting,
  (b) the place of negotiation of the contract,
  (c) the place of performance,
  (d) the location of the subject matter of the contract, and
  (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

resolving choice of law questions and adopted the "most significant relationship" approach set forth in § 6 of the Restatement (Second) of Conflict of Laws.[2] The guidelines in § 6 direct courts to identify the relative interest of each state in having its law applied, and then to balance the interests of the affected states with the factors listed in the Restatement (Second). However, a court should only resort to the § 6 guidelines in the absence of either a valid contractual agreement between the parties regarding the applicable law, or a local statutory provision controlling the disposition of the choice of law question.

Comment (a) of § 6 states "A court, subject to constitutional limitation, must follow the directions of its legislature." *See also* Reese, *Conflict of Laws and the Restatement Second*, 28 Law & Contemp.Prob. 679 (1973). Such is our case. Texas Ins. Code Ann. art. 21.42 (1981) provides:

Art. 21.42. Texas Laws Govern Policies

Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporation issuing the same.

Here both American Home and National Union Fire were at all times "doing business" in Texas. Moreover, at the moment the Texas juries in both the underlying personal injury actions returned a verdict legally obligating Rawlings and Safway to pay the respective plaintiffs certain sums for both compensatory and punitive damages, both insurance policies became "payable" under their own terms.

Article 21.42 has been previously upheld as constitutional. *Austin Bldg. Co. v. National Union Fire Ins. Co.*, 432 S.W.2d 697 (Tex.1968). The only limitation is that art. 21.42 may not be given an extraterritorial effect. *Aetna Life Ins. Co. v. Dunken*, 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342 (1924). In other words, the statute may not be used in a way which regulates business outside the State of Texas.

We have little difficulty in concluding that art. 21.42 requires us to apply Texas law to the issues in this appeal. In reaching this conclusion, we have considered and rejected the argument that application of Texas law would in essence regulate business outside of our State. Further, we cannot agree with the necessarily attendant proposition that New York, Missouri, and Wisconsin have *any* interest in determining which parties are financially responsible for paying a Texas jury verdict.

■ The fact that the respective insurance policies were negotiated, executed and premiums paid elsewhere in no way alters the tenor placed on the litigation when the instigating events arose in Texas. Our analysis of the choice of law issues in this appeal has led us to conclude that Texas has adequate contacts to sustain the choice of forum law under art. 21.42. *See Allstate Insurance Co. v. Hague*, 449 U.S. 302, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981); *see also*, Leflar, *The Nature of Conflicts Law*, 81 Colum.L.Rev. 1080 (1981). Nevertheless, we have also analyzed each state's particular interests in having its law applied and that state's contact with the particular issues in this appeal.

---

**2.** § 6. Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

As we indicated earlier, following *Duncan v. Cessna, supra,* the substantive law of the state most significantly related to the disputed issue will apply to future choice of law cases, unless the parties expressly contract otherwise. However, the *Duncan* Court did not adopt the Restatement (Second) as a whole. *See* Comment, *Texas Contract Choice of Law Rules After Duncan v. Cessna Aircraft Company,* 36 Baylor L.Rev. 491, 496 (1984). Nonetheless, for purposes of this opinion, we will adopt appellants' argument that our decision should be based on the more specific choice of law rules governing contracts.

Section 188 of the Restatement (Second) of Conflict of Laws provides that "with respect to an issue in contract" the relevant contacts to be taken into account in applying the principles of § 6 include such matters as the place of contracting, place of negotiation, and place of performance of the contract. However, as comment (e) of § 188 indicates, these factors merely indicate which states are most likely to be "interested" within the meaning of § 6. Hence, at best, the § 188 factors only pertain to one part of a larger analytical scheme that determines whose local law will be applied to resolve the issue at hand.

As appellants' application of the § 188 factors indicates, the potentially-interested jurisdictions, other than Texas, include New York, Missouri, and Wisconsin. In accordance with comment (d), we have analyzed each of the two principal issues in this appeal separately in order to determine whether either would be resolved differently under the local law of two or more of the potentially-interested states.

■ 1. *Construction of the Coverage Provisions of the Policies:* The choice of law question here is not whether Missouri, New York, Wisconsin or Texas would interpret the policy as providing liability coverage for punitive damages, but rather whether the rules of interpretation employed in construing the insurance policies differ.

In general, Texas courts will enforce an insurance policy as written if the language used is free from any ambiguity. *Glover v. National Insurance Underwriters,* 545 S.W.2d 755 (Tex.1977). However, if the language is subject to two or more reasonable interpretations, the construction which affords coverage will be adopted. *Blaylock v. American Guarantee Bank Liability Insurance Co.,* 632 S.W.2d 719 (Tex. 1982). This policy of construction against the insurer and in favor of the insured is especially strong when the court is dealing with exceptions and words of limitation. *Id.* at 721.

■ We do not address the specific rules of construction under New York law, since New York refuses on public policy grounds to enforce insurance contracts which insure against liability for punitive damages. *See Hartford Accident and Indemnity Company v. Village of Hempstead,* 48 N.Y.2d 218, 422 N.Y.S.2d 47, 397 N.E.2d 737 (1979); *Padavan v. Clemente,* 43 A.D.2d 729, 350 N.Y.S.2d 694 (1973); *see also, Hafner v. Guerlain, Inc.,* 34 A.D.2d 162, 310 N.Y.S.2d 141 (1970). Hence, a false conflict exists regarding the policy construction issue—because of public policy consideration, a New York court would never employ its rules of construction to resolve our particular issue. *Accord, Beaver v. County Mutual Insurance Co.,* 95 Ill.App. 3d 1122, 51 Ill.Dec. 500, 420 N.E.2d 1058 (1981).

■ A Missouri court has recently been called upon to interpret policy provisions virtually identical to the policies issued by appellants, and concluded that the phrase "all sums which the insured shall become obligated to pay as damages because of bodily injury" *does not* include awards for punitive damages. *Schnuck Markets, Inc. v. Transamerica Insurance Co.,* 652 S.W. 2d 206, at 211 (Mo.App.1983). Following Missouri rules of contract construction, the court did not indulge in any particular presumption in favor of the insured, and concluded that the policy language unambiguously excluded coverage for punitive damages.

In contrast, under Wisconsin principles of law, the test is not what the insurer

intended the words to mean, but rather what a reasonable person in the position of the insured would have understood them to mean. *Kremers–Urban Co. v. American Employers Insurance*, 119 Wis.2d 722, 351 N.W.2d 156 (1984). Words or phrases will be considered ambiguous when they are fairly susceptible to more than one construction. *Brown v. Maxey*, 124 Wis.2d 426, 369 N.W.2d 677 (1985). Where no ambiguity exists, Wisconsin courts will merely apply the policy terms. *Id.* 369 N.W.2d at 686. Additionally, any provision tending to limit the liability of the insurance company is construed *most strongly* against the insurance company if ambiguous. *Wisconsin Builders, Inc. v. General Insurance Company*, 65 Wis.2d 91, 221 N.W.2d 832 (1974).[3]

Hence, there is no conflict between the applicable Wisconsin and Texas rules of contract construction. In fact, given the factual circumstances in *Brown v. Maxey, supra,* we believe Wisconsin would interpret the policies issued by appellants in the same manner and reach the same conclusions as a Texas court applying Texas law.

Since we have identified a conflict in the pertinent local law of Texas and Missouri, § 188 directs us to identify the interests of each state in having its rule of law applied to this appeal. We then assess the relative strength of those interests based primarily upon the specific contacts set forth in § 188, as they relate to the issue of policy construction.

■ The factual contacts Missouri has with our specific policy interpretation questions are: (1) the American Home insurance policy was countersigned in Missouri; (2) American Home was doing business in Missouri at the time the policy was issued; and (3) Rawlings' principal place of business is in Missouri. None of these contacts are, however, especially important to a determination of whether Missouri law should be applied in resolving whether American

Home's policy with Rawlings excludes punitive damages awarded by a Texas jury. Hence, any interest Missouri may have in having its rule of law applied is relatively minor.

By comparison, the Texas interests are relatively strong. For instance, Texas has a policy of regulating insurance contracts payable to inhabitants of Texas. Tex.Ins. Code Ann. art. 21.42 (1981). Article 21.42 represents an identifiable statement by the Texas legislature regarding Texas public policy. In addition, the applicable Texas rules of construction favor interpreting ambiguous policies in favor of the insured, which indicates a state interest in protecting the policyholder.

■ Appellants argued before this Court that since the Texas personal injury plaintiffs have been paid on their judgments against Rawlings and Safway, all Texas contacts and interests in construing the insurance contracts have somehow evaporated. We disagree. Although the compensation of Texas residents is no longer a concern, the fact remains that the instigating event—imposition of punitive damages—occurred in Texas.

If we allowed appellants to dissociate themselves completely from the jurisdiction which imposed those damages, we would necessarily condone forum-shopping. Appellants could, after paying the primary personal injury action under the reservation of rights, seek a declaratory judgment in a state in which they were doing business and whose public policy precludes insuring against punitive damages. If the needs of the interstate system are to be served as § 6 of the *Restatement (Second) on Conflicts of Law* suggests, then the appropriate local law to be applied in resolving both the policy construction issues and public policy issues is the law of the state that imposed the punitive damages in the first place—Texas.

---

**3.** These rules of interpretation virtually mirror those in Texas. *See, e.g., Freeman v. Crown Life Insurance Co.,* 580 S.W.2d 897 (Tex.Civ.App. 1979, writ ref'd n.r.e.) (insurance policy terms are to be given normal and usual meaning ascribed to them by ordinary persons); *Prov-* *idence Washington Insurance Co. v. Proffitt,* 150 Tex. 207, 239 S.W.2d 379 (1951) (insurance policies that are susceptible to double construction or uncertain import are to be interpreted and construed liberally in favor of the insured and strictly against the insuror.)

In summary, we conclude that given the relevant state interests involved and the contacts of the states to the question of policy coverage, the trial court properly applied Texas law. Appellants' first point of error is overruled.

### 2. Public Policy Considerations:

Of the various jurisdictions identified by appellants, only New York expressly refuses, based upon public policy grounds, to enforce insurance policies covering punitive damages. See Hartford Accident and Indemnity Company, supra; see also Parker v. Agricultural Insurance Co., 109 Misc.2d 678, 440 N.Y.S.2d 964 (1981). Although the issue of insurability of punitive damages has not been as thoroughly discussed in Texas as it has elsewhere,[4] Texas law has nonetheless been interpreted to permit such coverage. See Dairyland County Mutual Insurance Co. v. Wallgren, 477 S.W.2d 341 (Tex.Civ.App.1972, writ ref'd n.r.e.); Home Indemnity Company v. Tyler, 522 S.W.2d 594 (Tex.Civ. App.1975, writ ref'd n.r.e.). The law in Missouri appears unsettled,[5] and Wisconsin allows coverage. See Colson v. Lloyd's of London, 435 S.W.2d 42 (Mo.App.1968); Crull v. Gleb, 382 S.W.2d 17 (Mo.App. 1964); Brown v. Maxey, supra. Hence, if a conflict exists, it exists only between New York and Texas law.[6]

Although New York's interest in not enforcing this type of policy is no doubt important, the New York § 188 contacts are at best tangentially related to the issue of insurability itself. Our conclusion that Texas law should be applied to this issue is also supported by other considerations. For instance, when the law of one state

4. See, e.g., Universal Indemnity Ins. Co. v. Tenery, 96 Colo. 10, 39 P.2d 776 (1934); Nicholson v. American Fire & Casualty Ins. Co., 177 So.2d 52 (Fla.App.1965); Greenwood Cemetery Inc. v. Travelers Indemnity Co., 238 Ga. 313, 232 S.E.2d 910 (1977); Skyline Harvestore Systems, Inc. v. Centennial Ins. Co., 331 N.W.2d 106 (Iowa 1983); First Nat. Bank of St. Mary's v. Fidelity & Deposit Co., 283 Md. 228, 389 A.2d 359 (1978); LoRocco v. New Jersey Mfgrs. Indemnity Ins. Co., 82 N.J.Super. 323, 197 A.2d 591 (1964); Lazenby v. Universal Underwriters Ins. Co., 214 Tenn. 639, 383 S.W.2d 1 (1964); Cieslewicz v. Mutual Serv. Cas. Ins. Co., 84 Wis.2d 91, 267 N.W.2d 595 (1978).

5. In Colson v. Lloyd's of London, supra, the Missouri Appeals Court held that allowing law enforcement officers to insure themselves against willful and intentional acts is not against Missouri public policy. In contrast, four years earlier, another Missouri Appeals court held, in dictum, that to allow a motorist to insure himself against punitive damages would be contrary to public policy. See Crull v. Gleb, supra. The court in Schnuck Markets, Inc. v. Transamerica Insurance Co., supra, never reached the public policy question.

6. It is not entirely clear that a "true conflict" exists between New York and Texas law. New York law allows an award for punitive damages only when the offending party's conduct amounts to a conscious disregard of the rights of others or for conduct so reckless as to amount to such disregard. Hartford Accident and Indemnity Company v. Village of Hempstead, supra; see also Hafner v. Guerlain, Inc., 34 A.D.2d 162, 310 N.Y.S.2d 141 (1970). In contrast, both Rawlings and Safway were assessed punitive damages based simply on their gross negligence. Although the argument may be made that gross negligence as defined under Texas law, encompasses the New York standard, the reverse proposition is not true. By not imposing punitive damages simply based on gross negligence, New York has purposely limited the availability of punitive damages to select factual circumstances.

The entire public policy argument behind not enforcing policies which insure against punitive damages changes from state to state. See generally City Products Corp. v. Globe Indemnity Company, 88 Cal.App.3d 31, 151 Cal.Rptr. 494 (1979). Insurance coverage is valid in those jurisdictions where punitive damages are allowed in respect to gross negligence or reckless or wanton conduct. In comparison, jurisdictions where punitive damages are limited to cases of fraud, oppression or malice have generally invalidated insurance coverage for punitive damages on public policy grounds. New York falls into the latter category.

Had the underlying personal injury actions been tried under New York law, punitive damages would not have been available, since New York does not allow punitive damages for gross negligence in products liability actions. Hafner v. Guerlain, supra. Since there are several public policy reasons supporting punitive damages, the public policy reasons for not allowing insurance of punitive damages are likewise different. Hence, it may not be said that New York has an interest in applying its rule of law to prevent an insurance company from paying a "punitive damage award" against its insured that would have never been assessed under New York law. The policies of an interested state are important only if an application of that state's laws would further these policies.

would invalidate the contract, but the law of another would uphold it, the Restatement (Second) favors applying the law of the state which would uphold the validity of the contract.

In addition, the policies underlying a particular state's law regarding punitive damages will in many cases reflect whether that state will allow a company or individual to obtain insurance against liability for possible punitive damage awards. Thus, the public policy issue is intertwined with the basic purposes sought to be achieved by the law which imposed the damages. If uniformity and predictability are to be achieved on resolving such issues, the local law which provides for the punitive damage award should also be used to resolve the insurability issue.

In summary, even if we were to adopt appellants' decisional framework on the choice-of-law question, we conclude that the district court correctly applied Texas law to the public policy issue. Appellants' second point of error is overruled.

## III. COVERAGE UNDER POLICY LANGUAGE

The threshold inquiry on this issue is whether the language used in the insurance policies covers punitive damages. The Rawlings policy requires American Home Assurance to pay the "total sum" for which the insured becomes obligated to pay by reason of personal injury caused by or arising out of an "occurrence." The policy issued to Safway requires National Union Fire to pay on behalf of Safway "all sums" for which Safway shall become legally obligated to pay as damages because of bodily injury caused by an "occurrence." Both policies then define "occurrence" as an event that results in personal or bodily

injury "neither expected nor intended from the standpoint of the insured."

Appellants maintain that appellees' conduct that gave rise to an award of punitive damages is *by definition* excluded from coverage under the term "occurrence." They contend that injuries resulting from grossly negligent conduct are either intended or expected from the insured's standpoint and therefore not covered under the policy.[7] In response, appellees contend that a reasonable person reading the terms "total sum" or "all sums" would expect those terms to include not only compensatory damages, but also punitive damages. Finally, appellees argue that, at best, the contract is ambiguous and should be interpreted in favor of coverage.

There is no language whatsoever in either the insuring agreement or the definitional sections which expressly excludes coverage for punitive damages. One can only reach an interpretation of exclusion through a technical analysis on whether the insured's gross negligence, which resulted in the injury causing event, constitutes conduct neither expected nor intended from the standpoint of the insured. On this point, reasonable arguments may be made on both sides. If we needed to reach this issue, we would conclude that punitive damages arising out of the insured's gross negligence are not by definition excluded from coverage based upon the intentional injury exclusion provision of the policy.[8] However, we conclude that a much more obvious reason supports coverage.

The insuring agreements begin with virtually identical language obligating the insured to pay "all sums" or the "total sums" which the insured becomes legally obligated to pay as "damages". In this

---

7. Appellants' argument regarding the definition of "occurrence" is an attempt to lump the entire category of punitive damages within the broader policy exclusion of all damages resulting from the intentional conduct of the insured. *See generally* Annot., 31 A.L.R.4th 957 (1984) (the "neither expected nor intended from the standpoint of the insured" language is most commonly referred to as "an intentional injury clause").

8. The term "occurrence" by definition is limited to acts where the conduct is intended to bring about a result to this extent the terms "intended" and "expected" are construed together. We refuse to extend the "intentional injury exclusion" to include conduct amounting to gross negligence. *See e.g., Continental Insurance Companies v. Hancock,* 507 S.W.2d 146 (Ct.App.Ky. 1973); *Hensley v. Erie Ins. Co.,* 168 W.Va. 172, 283 S.E.2d 227 (1981).

regard, it is important to observe that the insurance contracts here have nationwide effect and contain standard contractual provisions. As a result, we are not the first court to be called upon to interpret these particular terms.

The majority of courts that have addressed this question and found coverage have generally done so based on the following arguments: (1) the average insured, in the absence of an express policy exclusion from liability from punitive damages, would assume that the term "damages" would include punitive damages, since they would become by judgment a "sum" that the insured would be legally obligated to pay; (2) because the insurer drafted the policy and could have made clear its intention to exclude coverage for punitive damages, the rules of construction require it to bear the burden of ambiguity, and (3) punitive damages are covered because they always "arise" out of the underlying action for injury.[9]

The Texas courts that have interpreted the "all sums" phrase have held that the term encompasses punitive damages. *See Dairyland County Mutual Ins. Co. v. Wallgren, supra; Home Indemnity Company v. Taylor, supra.* In fact, the majority of courts in other jurisdictions that have addressed this construction issue have concluded that the term covers punitive damages. Annot., 20 A.L.R.3d 320 (1980). We mention this fact solely to show that past interpretations would lead the average policy holder reading this language to expect protection against *all* claims that are not the result of an intentional tort. When problems of contractual clauses are involved, precedent is necessarily a highly important factor, and contracting parties generally select a judicially-construed clause with the intention of adopting the meaning that the courts have approved. *Hardware Dealers Mutual Insurance Co. v. Berglund,* 393 S.W.2d 309 (Tex.1965).

According to the principles of Texas law previously articulated, policy terms are to be given the normal and usual meanings ascribed to them by an ordinary person. We conclude that both policies, at best, may be termed "ambiguous" and should therefore be interpreted in favor of coverage. *See Blaylock v. American Guarantee Bank Liability Insurance, supra.* Moreover, upon reading the policy provisions, and in the absence of any express exclusion of liability for punitive damages, we conclude a person insured by such a policy would have reason to believe that his premiums protect him against liability for "all sums" that the insured might become "obligated to pay", and that the term "damages" would include both compensatory and punitive damages which become, by judgment, a "sum" that he is legally obligated to pay.

The language used in both the Rawlings and Safway policies makes no distinctions as to the type of "damages" that are covered up to the policy limits. For purposes of excluding categories of damages, distinctions drawn upon the nature of the insured's acts are not enough. Almost every conscious or voluntary act may be considered "intended" or "expected." There is nothing in the policy itself which would otherwise forewarn an insured that the intent of the parties was to exclude punitive damages based upon the insured's gross negligence. Appellant insurance companies could have easily removed any ambiguity by including an express exclusion from liability for punitive damages.

Questions of policy coverage are, of course, questions of law. Since we have concluded that both policies cover punitive damages, we do not need to address appellants' individual points of error regarding the sufficiency of the evidence to support the district court's findings that the underlying personal injury actions arose out of an "occurrence" or that the punitive damages were not assessed "because of personal (or bodily) injury." Points of error three, four, five, six, eight and nine are overruled.

---

**9.** *See generally* Burrell & Young, *Insurability of Punitive Damages,* 62 Marg.L.Rev. 1, 12 (1978); Ghiardi & Kircher, *Punitive Damages: Law and* Practice, § 705 (1984); Schumaier & McKinsey, *The Insurability of Punitive Damages,* 72 Am.B.J. 68 (March 1, 1986).

## IV. PUBLIC POLICY

The last issue we must address is whether Texas public policy prohibits the enforcement of an insurance contract covering punitive damages. In *Dairyland County Mutual Ins. Co. v. Wallgren, supra,* the Court of Appeals defined public policy with reference to the law of Texas as embodied in its constitution, statutes, decisions of its courts, and the administrative practices of its state's officers. Since the automobile liability policy issued by Dairyland was written in accordance with the terms and conditions of insurance policies set out by the Insurance Commission, the court concluded that the policy could not contravene public policy. This line of reasoning is not, however, without its critics. *See* Comment, *Insurability Against Punitive Damages: A Call For Reform,* S.Tex. L.J. 443, 451 (1982).

The earliest reported Texas cases concerning punitive damages adopted the view that such damages were intended primarily to serve as "punishment":

> Where either of the elements of fraud, gross negligence, or oppression mingle in the controversy, the law, instead of adhering to the system or even the language of compensation, adopts a wholly different rule. It permits the jury to give what it terms punitory, vindictive, or exemplary damages, in other words, blends together the interests of society and the aggrieved individual, and gives damages not only to recompense the sufferer, but to punish the offender.

*Graham v. Roder,* 5 Tex. 141 (1849).

Although recovery of punitive damages is available in a variety of cases, most awards have been founded on willful or malicious conduct of the defendant. *See generally* Demarest, *The History of Punitive Damages in Texas,* 28 S.Tex.L.Rev. 535 (1987). However, with the decision in *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981), awards of punitive damages based upon the defendant's gross negligence have become more common, especially in the products liability area. *See, e.g., International Armament Corp. v. King,* 686 S.W.2d 595 (Tex.1985); *Ford Motor Co. v. Nowak,* 638 S.W.2d 582 (Tex. App.1982, writ ref'd n.r.e.); *Rawlings Sporting Goods Co. v. Daniels, supra.*

Appellants argue that allowing appellees to insure themselves against an award of punitive damages thwarts the principal purposes behind punitive damages—punishment and deterrence. The often-cited legal authority for this position is *Northwestern National Casualty Company v. McNulty,* 307 F.2d 432, 440-01 (5th Cir.1962), wherein Judge Wisdom stated:

> Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct. It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent.
>
> The policy considerations in a state where, as in Florida and Virginia, punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest ultimately as well [as] nominally on the party actually responsible for the wrong. If that person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole. And there is no point in punishing the insurance company; it has done no wrong. In actual fact, of course, and considering the extent to which the public is insured, the burden would ultimately come to rest not on the insurance companies but on the public, since the added liability to the insurance companies would be passed along to the premium payers. Society would then be punishing itself for the wrong committed by the insured.

Despite having recognized identical purposes behind punitive damages, other courts addressing the issue have reached the opposite conclusion. *See, e.g., Lazenby*

v. *Universal Underwriters Ins. Co.*, 214 Tenn. 639, 383 S.W.2d 1 (1964); *Harrell v. Travelers Indemnity Co.*, 279 Or. 199, 567 P.2d 1013 (1977); *see generally* Ghiardi & Kircher, *Punitive Damages: Law and Practice, supra* at § 712; Annot., 16 A.L. R.4th 11 (1982).

Rather than grappling with this entire question, we have narrowed our analysis strictly to the facts at hand. Thus, the question we address is this—Is it consistent with Texas public policy for a corporation to insure itself against the gross conduct of its agents? After *Burk Royalty Co. v. Walls*, the ability of a plaintiff to allege and obtain a punitive damage award has undoubtedly been enhanced. As a consequence, business and professional persons, firms and corporations constantly face the risk that where gross negligence is alleged, a verdict for punitive damages might well follow.

Against this background of increased availability of punitive damages, we address the issue of whether insuring against punitive damage awards is consistent with the dual purposes of punitive damages: punishment and deterrence.

Opponents of coverage argue that by allowing a corporation to insure itself against its own wrongs, the corporation is able to "shift the burden" of the punitive damage judgment to the insurance company. In the end, the only persons actually "punished" are the innocent members of society who purchase insurance. *See Northwestern National Casualty Company v. McNulty, supra* at 440–41. We believe this argument is overly simplistic.

An insurance company that deliberately enters into a contract to provide coverage against liability for punitive damages is free to charge additional premiums for such coverage, so as to provide a separate fund for the express purpose of paying such judgments without "punishing" either the insurance company or society. The insurance company is also free to deny coverage of punitive damages altogether. In the case of an established corporation, it is important to note that its inability to obtain such coverage will inevitably be passed on to the consumers of its products—who are also innocent.

The question of how to "punish" a corporation is a difficult one. At best, some pressure may be exerted on the directors through the corporate shareholders to remove agents of the corporation whose actions or omissions led to the particular conduct being punished. More realistically, the cost of paying the judgment will be borne not by the culpable corporate agents, but by the corporation's customers. Moreover, in the normal course of business, corporate officials will punish the offending agents themselves. The threat of increased premiums and the possibility of damages exceeding policy limits appear sufficient to preserve this pressure to discharge the agents whose conduct is deemed improper.

In cases where the corporation is less well-established or affluent, its inability to insure against such liability may well cause a permanent financial collapse. Not only may the size of the business prevent it from shifting the burden, but the effect of the financial collapse will be permanent, since such a judgment is not dischargeable in bankruptcy. Yet the instigating event may arise from only a single incident of gross negligence on the part of an agent. A fine line separates conduct that justifies imposition of punitive damages from conduct that does not.

It is doubtful whether the denial of insurance coverage for liability against punitive damages actually deters culpable actors. *Price v. Hartford Accident and Indemnity Company*, 108 Ariz. 485, 502 P.2d 522 (1972). In Texas, juries are not allowed to consider the defendant's wealth, resources, or insurance coverage when assessing *compensatory or punitive damages*. Whatever deterrence value punitive damages have under Texas law, we see no hindrances to the practical achievement of those objectives under a policy of law that allows for insuring against liability for punitive damages.

## CONCLUSION

We find no public policy against allowing insurance coverage against punitive dam-

ages. As long as insurance companies are willing, for a price, to provide protection against liability for punitive damages to corporations they deem "good risks," and as long as punitive damage liability continues to extend to "gross negligence," we see no reason why these contracts should not be enforced:

> It is one thing for an insurance company to write a policy with provisions which exclude liability for punitive damages and to ask that this court construe and apply such policy provisions. It is quite another thing, however, for an insurance company which has written and issued an insurance policy in terms which include coverage for punitive damages—presumably at a premium which the insurance company believed to be sufficient as consideration for such coverage—to ask this court to relieve it from such liability under its own insurance contract by a judicial declaration that the contract is void for reasons of public policy.

*Harrell v. Travelers Indemnity Co., supra* 567 P.2d at 1021–22.

We conclude that public policy would be best served by requiring the insurance company to honor its obligation. Accordingly, we hold that under Texas law it was not contrary to public policy for Rawlings and Safway to shift the punitive damages awards to their liability insurance carriers, and that, under the terms of the insurance contracts between the parties, punitive damages were within the scope of coverage. Point of error ten is overruled.

Since we conclude that the district court properly rendered judgment in favor of appellees, we also find no abuse of discretion in its award of attorney's fees to appellees.[10] Appellants' point of error eleven is also overruled.

The appellees have brought two cross-points claiming error by the district court in its findings of fact. However, we find nothing in the record to indicate that appellees brought the claimed errors to the at-

tention of the district court; accordingly, they were waived. *See, e.g., West Texas Utilities Co. v. Irvin,* 161 Tex. 5, 336 S.W. 2d 609 (1960); State Bar of Texas, *Appellate Procedure in Texas,* § 15.16 (2d ed. 1979).

The judgment of the trial court is affirmed.

---

10. Tex.Prac. & Rem. Code Ann. § 37.009 (1986) empowers the trial court to award both costs and reasonable and necessary attorney's fees as are equitable and just in a declaratory judgment action taken under chapter 37. That award will

not be set aside absent a showing that the trial court abused its discretion in making the award that it did. *Zaruba v. Zaruba,* 498 S.W.2d 695 (Tex.Civ.App.1973, writ dism'd).