IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 04-0728
════════════
 
Fairfield Insurance Company, 
Appellant,
 
v.
 
Stephens Martin Paving, LP; 
Carrie Bennett,
Individually and as 
Representative of the Estate of
Roy Edward Bennett, 
Deceased, and as Next Friend of
Lane Edward Bennett, Cody 
Lee Bennett, and April Anne Bennett, Minors, Appellees
 
════════════════════════════════════════════════════
On Certified Question from the United 
States
Court of Appeals for the Fifth 
Circuit
════════════════════════════════════════════════════
 
 
Argued November 9, 
2004
 
 
            
Justice Hecht, joined by 
Justice Brister, Justice Medina, and Justice Willett, concurring.
 
 
            
The United States Court of Appeals for the Fifth Circuit has certified to 
us[1] this question: “Does Texas public policy 
prohibit a liability insurance provider from indemnifying an award for punitive 
damages imposed on its insured because of gross negligence?”[2] As usual, the Circuit “disclaim[s] any 
intention or desire that the Supreme Court of Texas confine its reply to the 
precise form or scope of the question certified.”[3] The Court answers “no” for the workers’ 
compensation insurance at issue in the federal court action, but the Circuit’s 
question is broader and deserves a fuller response than the Court gives. The 
Court provides some insight into the relevant considerations, but I would add to 
them and describe in more detail the way they should be analyzed. Most of what I 
say is consistent with the Court’s opinion, and to that extent I join it.
I
            
I begin with a few general observations.
            
Texas 
law recognizes and protects a broad freedom of contract. We have repeatedly said 
that:
if there is one thing which more than another public policy 
requires it is that men of full age and competent understanding shall have the 
utmost liberty of contracting, and that their contracts when entered into freely 
and voluntarily shall be held sacred and shall be enforced by Courts of justice. 
Therefore, you have this paramount public policy to consider — that you are not 
lightly to interfere with this freedom of contract.[4]
Still, freedom 
of contract is not unbounded. “As a rule, parties have the right to contract as 
they see fit as long as their agreement does not violate the law or public 
policy.”[5]
            
We have voided contractual provisions that are contrary to public 
policy,[6] including insurance policy provisions.[7] But we have also recognized that 
“[c]ourts must exercise judicial restraint in deciding 
whether to hold arm’s-length contracts void on public policy grounds”.[8] We observed long ago:
 
According to the well-known dictum of an English judge, public 
policy “is a very unruly horse, and when you once get astride it, you never know 
where it will carry you.” This striking illustration admonishes us that the 
words “public policy” are vague in meaning and dangerous of application, and 
that, unless we exercise due discrimination, we are likely to fall into error 
when we come to apply them to the construction of a contract, with a view to 
determine the validity of its provisions.[9]
 
 
For this 
reason, a state’s public policy must be carefully “deduced from its 
constitution, laws, and judicial decisions.”[10] The requirement of deduction is 
critical; it circumscribes judicial authority. Courts are to derive public 
policy from existing law, not create it. And courts must also recognize that 
public policy may change over time.[11]
            
Insurance is “an agreement by which one party assumes a risk faced by 
another in return for a premium payment.”[12] This risk-shifting is the purpose of 
insurance.[13] When the agreement is unique, the 
insured’s risk is transferred to an insurer who bears it alone, but when the 
agreement is a standard policy offered by an insurer to the general public, the 
insured’s risk is, in a real sense, borne by the insurer’s policyholders as a 
group, from whose pool of premiums all claims must be paid if the insurer is to 
remain in business. One public-policy concern is whether it is or is not in the 
public interest for a risk to be shifted. As the cases cited in the margin 
illustrate, public policy sometimes insists on risk-shifting,[14] sometimes prohibits it,[15] and sometimes is indifferent, leaving 
the matter to the parties’ contract.[16]
            
In some instances, the effect of public policy on insurance is relatively 
simple and uncontroversial. For example, the beneficiary of a life insurance 
policy must have an insurable interest in the insured’s life. As the basis for 
that rule, we quoted the United States Supreme Court more than a century ago: 
“It is generally agreed that mere wager policies — that is, policies in which 
the assured party has no interest whatever in the matter insured, but only an 
interest in its loss or destruction — are void, as against public policy.”[17] The rule is unquestioned to this day. As 
another court has more recently explained:
 
The insurable interest requirement for beneficiaries of life 
insurance rests on two coexisting policy considerations: (1) that no inducement 
be offered to one person to take the life of another; 
and (2) that no one should be permitted to wager on the continuation of a human 
life.[18]
 
            

Other 
instances, however, may implicate multiple, conflicting policies. For example, 
we once held that if co-owners of property were insured under the same policy 
and one of them damaged the property, the innocent owner could not recover on 
the policy because the wrongdoer would also benefit through his ownership 
interest, and “public policy dictates that a wrongdoer should not benefit from 
his wrongdoing.”[19] Years later, we came to see that the 
public policy concerns implicated in the issue were broader and conflicting; 
these concerns include the prevention of insurance fraud by co-owners acting in 
collusion, the prevention of unjust enrichment of insurers, and the injustice of 
imputing one person’s criminal acts to an innocent victim.[20] On balance, we concluded that the law 
should permit the innocent insured to recover, at least in some circumstances.[21] Still later, we held that when the 
co-insureds were married and the property was 
community, recovery on the policy by the innocent spouse could not be 
conditioned on divorce or partition because the public policy against divorce 
was more important than the possibility that the wrongdoing spouse might 
benefit.[22] Different policies called for a 
different rule in different situations.
            
In sum, “the business of [insurance] is affected with a public 
interest”[23] that is neither simple nor static and 
that supercedes the parties’ freedom to contract for 
the shifting of risks in some instances and not in others. With that predicate 
in mind, I turn to the Circuit’s question.
II
            
The sources of public policy considerations relevant to the Circuit’s 
question are statutes stating the purpose of punitive damages and prescribing 
the manner in which they are to be assessed, other statutes allowing and 
disallowing insurance for punitive damages, administrative regulations of 
insurance, Texas caselaw, and 
caselaw in other American jurisdictions. I examine 
each in turn.
A
            
The first public policy consideration, and perhaps the most important 
because the Legislature has firmly spoken, is that the purpose of punitive 
damages is to punish. At one time, punitive damages were awarded not only to 
punish the defendant (hence “punitive”) but to deter others (hence “exemplary”) 
and to compensate the plaintiff for losses for which the law provided no 
recovery, like inconvenience, attorney fees, and mental anguish.[24] But over the years, new elements of 
damages became recoverable for many causes of action, thus affording a fuller 
range of compensation for many claimants. Eventually, in 1987, the Legislature 
limited the purpose of punitive damages, providing, in Chapter 41 of the Texas 
Civil Practice and Remedies Code, at section 41.001(3) that:
 
“Exemplary damages” means any damages awarded as an example to 
others, as a penalty, or by way of punishment. “Exemplary damages” includes 
punitive damages.[25]
 
 
Based on this 
statute, we held that “punitive damages are levied for the public purpose of 
punishment and deterrence”,[26] omitting — as the Legislature had done — 
compensation to the plaintiff as part of the purpose of punitive damages. In 
1995, the Legislature renumbered the provision Section 41.001(5) and amended it 
to delete the phrase, “as an example to others”, leaving punishment as the sole 
purpose of punitive damages.[27] The statute was amended again in 2003,[28] again to make clear that punitive 
damages are not compensatory, and it now states:
 
“Exemplary damages” means any damages awarded as a penalty or 
by way of punishment but not for compensatory purposes. Exemplary damages are 
neither economic nor noneconomic damages. “Exemplary damages” includes punitive 
damages.[29]
 
 
            
As originally enacted, Chapter 41 applied to any action for negligence 
and any action for personal injury, property damage, or death based on strict 
liability, products liability, or breach of warranty,[30] but there were sixteen exceptions.[31] In 1995, Chapter 41 was amended[32] to reduce the exceptions to three: 
certain actions under the Texas Free Enterprise and Antitrust Act of 1983,[33] actions under the Deceptive Trade 
Practices–Consumer Protection Act[34] except as specifically provided in 
Section 17.50 of that Act,[35] and actions brought under Chapter 21 of 
the Texas Insurance Code.[36] A fourth exception was added in 2005 for 
actions under Chapter 36 of the Human Resources Code.[37] The Legislature’s enlargement of the 
scope of Chapter 41 over time reflects its intent to establish punishment of the 
defendant as the sole purpose of punitive damages in Texas.
            
Chapter 41 also makes clear that the punishment imposed through punitive 
damages is to be directed at the wrongdoer. Section 41.006 provides that “[i]n any action in which there are two or more defendants, an 
award of exemplary damages must be specific as to a defendant, and each 
defendant is liable only for the amount of the award made against that 
defendant.” A defendant’s liability for punitive damages based on the conduct of 
employees, agents, and associates is also limited. Section 41.005 provides that 
“a court may not award exemplary damages against a defendant because of the 
criminal act of another”[38] unless:
 
            
(1)        the criminal act was 
committed by an employee of the defendant;
 
            
(2)        the defendant is criminally 
responsible as a party to the criminal act under the provisions of Chapter 7, 
Penal Code;
 
            
(3)        the criminal act occurred 
at a location where, at the time of the criminal act, the defendant was 
maintaining a common nuisance under the provisions of Chapter 125, Civil 
Practice and Remedies Code, and had not made reasonable attempts to abate the 
nuisance; or
 
            
(4)        the criminal act resulted from the defendant’s intentional or 
knowing violation of a statutory duty under Subchapter D, Chapter 92, Property 
Code, and the criminal act occurred after the statutory deadline for compliance 
with that duty.[39]
 
 
Even when the 
actor is the defendant’s employee, the defendant is not liable for punitive 
damages unless:
 
            
(1)        the principal authorized 
the doing and the manner of the act;
 
            
(2)        the agent was unfit and the 
principal acted with malice in employing or retaining him;
 
            
(3)        the agent was employed in a 
managerial capacity and was acting in the scope of employment; or
 
            
(4)        the employer or a manager of the employer ratified or 
approved the act.[40]
 
 
            
If punitive damages are covered by insurance and paid from policyholders’ 
premiums, so that the wrongdoer suffers no more than a sliver of the sanction, 
the sting of punishment is dissipated. As Judge John Minor Wisdom explained in 
his seminal opinion on the insurability of punitive damages in Northwestern 
National Casualty Co. v. McNulty:
 
Where a person is able to insure himself against punishment he 
gains a freedom of misconduct inconsistent with the establishment of sanctions 
against such misconduct. It is not disputed that insurance against criminal 
fines or penalties would be void as violative of 
public policy. The same public policy should invalidate any contract of 
insurance against the civil punishment that punitive damages 
represent.
 
            
The policy considerations in a state where . . . punitive damages are 
awarded for punishment and deterrence, would seem to require that the damages 
rest ultimately as well as nominally on the party actually responsible for the 
wrong. If that person were permitted to shift the burden to an insurance 
company, punitive damages would serve no useful purpose. Such damages do not 
compensate the plaintiff for his injury, since compensatory damages already have 
made the plaintiff whole. And there is no point in punishing the insurance 
company; it has done no wrong. In actual fact, of course, and considering the 
extent to which the public is insured, the burden would ultimately come to rest 
not on the insurance companies but on the public, since the added liability to 
the insurance companies would be passed along to the premium payers. Society 
would then be punishing itself for the wrong committed by the insured.[41]
 
 
            
The insured in the case before us attempts to argue that insurance does 
not lessen the punishment of punitive damages. The insured’s premiums may 
increase. Its insurance may be cancelled. It may be forced out of business. It 
will be stigmatized as a wrongdoer. But even if an insured would not escape 
altogether the consequences of punitive damages, insurance would indisputably 
spread them among many who deserve no punishment at all, which would contravene 
the policy clearly reflected in Chapter 41.
            
Rather clearly, insuring against punitive damages impairs their 
purpose.   
B
            
The next question is whether insuring against punitive damages is 
consistent with the manner in which they are assessed. Chapter 41 provides that 
punitive damages can be awarded for fraud, malice, gross negligence, or a 
statutory violation.[42] “Fraud” does not include constructive 
fraud.[43] “Malice” requires specific intent to 
cause substantial injury.[44] “Gross negligence “ 
is defined as:
 
an act or omission:
 
            
(A)       which when viewed objectively 
from the standpoint of the actor at the time of its occurrence involves an 
extreme degree of risk, considering the probability and magnitude of the 
potential harm to others; and
            
(B)       of which 
the actor has actual, subjective awareness of the risk involved, but 
nevertheless proceeds with conscious indifference to the rights, safety, or 
welfare of others.[45]
 
 
Other 
statutory actions may prescribe a different culpable mental state for punitive 
damages.[46] With these basic standards in mind, 
section 41.011(a) provides:
            
In determining the amount of exemplary damages, the trier of fact shall consider evidence, if any, relating 
to:
 
 
            
(1)        the nature of the 
wrong;
 
            
(2)        the character of the 
conduct involved;
 
            
(3)        the degree of culpability 
of the wrongdoer;
 
            
(4)        the situation and 
sensibilities of the parties concerned;
 
            
(5)        the extent to which such 
conduct offends a public sense of justice and propriety; and
 
            
(6)        the net worth of the defendant.[47]
 
 
            
Three of these factors — (1), (2), and (5) — are objective. The nature of 
the wrong and character of the conduct consider the defendant’s actions in the 
abstract, compared with broad norms and expectations. Were the defendant’s 
actions the work of a moment or the product of careful plotting and planning? 
Did they threaten few or many? Were they merely wrong, or were they offensively 
wrong? Were they morally, criminally or otherwise especially culpable? Did they 
pose a heightened offense to public justice and propriety? For such questions, 
the identity of the defendant, whether an individual or an organization, is 
irrelevant; the nature of the conduct is what matters. On the other hand, three 
other factors — (3), (4), and (6) — are subjective. What was the defendant 
thinking? Was he vile, angry, or malicious, or was he consciously indifferent to 
an objectively extreme degree of risk to others? [48] What was the plaintiff thinking? Was he 
trusting or suspicious? What will it take to punish the defendant? Is he an 
individual with limited means or an entity with a large net worth?
            
Applying the objective factors is akin to deciding whether a crime should 
be a misdemeanor or a felony. The seriousness of the misconduct is not affected 
by whether the corresponding punitive damages must be paid by the defendant’s 
insurer rather than the defendant. But the subjective factors help determine 
what a specific defendant should be required to pay a specific plaintiff. If 
punitive damages are covered by insurance, and the burden of payment thus shared 
in effect by the insurer’s policyholders, it makes no sense to set the amount 
based on whether the plaintiff was trusting or the defendant was calculating or 
wealthy. What a group should pay, as opposed to an individual, depends on how 
innocent most plaintiffs are, how culpable most defendants are, and the 
defendants’ mean net worth. From individual, subjective circumstances one cannot 
extrapolate what penalty the community should bear.
            
The Legislature has required that the specific circumstances of a 
plaintiff and a defendant be taken into account in determining what amount of 
punitive damages should be assessed against the defendant and paid to the 
plaintiff. Insurance coverage makes this impossible. The amount an insured 
defendant will pay depends on the extent of coverage and any deductible. Thus, 
insuring against punitive damages conflicts with the way in which such damages 
must be assessed under Chapter 41.
C
            
In a few instances, the Legislature has expressly prohibited or limited 
insurance for punitive damages; in a few others, it has expressly allowed such 
insurance. Although all legislative action is relevant in determining public 
policy, little can be learned from the statutory provisions related to punitive 
damages.
            
For reasons never entirely clear, the Legislature has restricted the 
availability of punitive damages coverage to health care providers, then lifted 
those restrictions in specific instances. In 1977, as part of the bill adopting 
the Medical Liability Insurance Improvement Act of Texas, the Legislature 
provided that professional liability insurance policies issued for physicians 
and certain other health care providers “in this state”, including hospitals and 
not-for-profit nursing homes, could not include punitive damages coverage.[49] Since the Act addressed what the 
Legislature found to be a “medical malpractice insurance crisis”,[50] the prohibition may have been intended 
to reduce insurance premiums.[51] But it has never been clear whether the 
prohibition applied to insureds “in this state” or 
only policies issued “in this state”, so that punitive damages coverage could be 
obtained from out-of-state insurers.[52] If the latter, then 
the effect of the prohibition on insurance costs was diminished. 
Furthermore, in 1987, 1997, 2001, and 2003, the statute was amended to allow the 
Board of Insurance, and later the Commissioner, to approve a policy endorsement 
providing punitive damages coverage first for hospitals, then not-for-profit 
nursing homes, then for-profit nursing homes, and finally assisted living 
facilities.[53] These amendments suggest that insurance 
cost control was never the Legislature’s motivation. Indeed, it is difficult to 
discern in these amendments any policy or policies whatsoever. The statute now 
provides:
 
            
(a)        Except as provided by 
Subsection (b), a medical professional liability insurance policy issued to or 
renewed for a physician or health care provider in this state may not include 
coverage for exemplary damages that may be assessed against the physician or 
health care provider.
 
            
(b)        The commissioner [of 
insurance] may approve an endorsement form that provides for coverage for 
exemplary damages for use on a medical professional liability insurance policy 
issued to:
 
            
(1) a hospital; or
 
            
(2) a for-profit or not-for-profit nursing home 
or assisted living facility.[54]
 
 
            
Several times the Legislature has created or modified guaranty funds and 
excess liability pools, prohibiting them from paying punitive damage claims 
either entirely or in part.[55] In each instance the Legislature’s 
concern appears to have been for the economic impact on these entities of 
insurance for punitive damages.
            
Finally, since 1987 the Legislature has required commercial liability 
insurers to file closed claim reports including, among much other information, 
“amounts paid for . . . punitive damages”.[56] The reports, which are still required,[57] show that punitive damages factor only 
very slightly into the settlement of commercial liability claims.[58]
            
From this legislative activity only a few inferences can be drawn. Since 
1977, the Legislature seems to have been concerned that liability insurance for 
health care providers offered by Texas insurers not be made more expensive by 
coverage of punitive damages. But health care providers may not have been 
prevented from obtaining insurance covering punitive damages from insurers 
outside Texas, and assuming such coverage comes 
at additional expense, it has presumably had an effect on the cost of health 
care in Texas. 
Also, since 1987, the Legislature has made various exceptions for hospitals, 
nursing homes, and assisted living facilities, and it is not clear why, or why 
there have been no other exceptions. The Legislature has also shown concern that 
guaranty funds and excess liability pools, entities funded by assessments and 
therefore of limited means, not be burdened by payments for punitive damages. 
Again, its concern appears to be economic, even when a pool covers governmental 
entities whose liability for punitive damages is limited.[59]
            
Because the Legislature’s first enactment limited the availability of 
punitive damages coverage, it may be tempting to infer that such coverage did 
not offend public policy before 1977 and does not do so since except in the 
specific situations the Legislature has identified. But this supposes that the 
Legislature has taken a comprehensive view of the subject when in fact its 
actions have been sporadic over three decades, directed to specific, narrow 
circumstances, and largely unexplained. If the predominant concern is the 
economic effect of such coverage, as it seems to have been, it is not clear why 
that concern has been given voice in only a few situations when it speaks to 
many.
            
Thus, it is difficult to find an indication of public policy in the 
legislative limitations on, and express approvals of, punitive damages 
coverage.
D
            
Insurance in Texas, as in other states, is thoroughly 
regulated. For the most part, policy forms must be approved by the Commissioner 
of Insurance, and in some instances the Commissioner is authorized to prescribe 
the use of standard policy forms.[60] The workers’ compensation policy from 
which the Fifth Circuit’s certified question comes is a standard form policy.[61]
            
The Commissioner’s approval of policy forms including and excluding 
various types of coverage is some reflection of public policy. Standard form 
personal automobile policies do not state specifically whether punitive damages 
are covered, and while two courts have concluded that punitive damages are 
damages for bodily injury covered by automobile policies,[62] that position has been uniformly 
rejected in the context of uninsured and underinsured motorist coverage[63] and is therefore dubious at best. 
Standard form homeowners’ policies also do not appear to cover punitive damages 
although the subject is not expressly addressed in the policies. Other policies 
shave been held to cover punitive damages in the absence of a provision 
specifically excluding such coverage.[64]
            
The workers’ compensation policy in the case before the Fifth Circuit 
specifically excluded punitive damages assessed “because of bodily injury to an 
employee employed in violation of the law” but specifically included punitive 
damages assessed for the death of an employee caused by the employer’s gross 
negligence or intentional conduct. Although workers’ 
compensation benefits are ordinarily the exclusive remedy for an employee 
injured on the job,[65] an action for punitive damages for the 
death of an employee caused by the employer’s gross negligence is preserved by 
Article XVI, § 26 of the Texas Constitution,[66] adopted at a time when, as already 
explained, punitive damages were thought to have a compensatory function. Also, 
by making a person who kills another “responsible” to the surviving family, the 
constitutional provision in essence creates a wrongful death action, which the 
common law did not allow, only with a heightened standard of proof and limited 
recovery. In both respects, insurance coverage for punitive damages does not 
present the same inconsistencies with the purpose and manner of assessing 
punitive damages that such coverage would otherwise.
            
Without a complete review of insurance regulation, it is impossible to 
determine what factors influence the Commissioner of Insurance in deciding 
whether to approve or disapprove punitive damages coverage. But because of the 
Commissioner’s role in regulating the insurance business in Texas, that decision 
must be taken into account in considering whether the coverage is against public 
policy.
E
            
A few cases applying Texas law have considered whether insurance for 
punitive damages is against public policy. These may be divided into three 
categories in which the punitive damages to be covered are assessed against (1) 
someone other than the insured, (2) an individual insured based on his own 
conduct, and (3) a corporate insured based on the conduct of its employees.
            
In the first category are cases involving uninsured or underinsured 
motorist coverage in which the insured seeks to recover from his own insurer 
punitive damages assessed against a third-party tortfeasor. Recent Texas courts have uniformly rejected such 
recovery as against public policy.[67] In that situation, the burden of the 
punitive damages would fall entirely on the insurer and its innocent investors 
and policyholders, not on the tortfeasor, thereby 
entirely defeating the purpose of such damages. In one case, State Farm 
Mutual Automobile Insurance Co. v. Shaffer, Shaffer was injured in an 
automobile accident with Torres. The court of appeals held that it was against 
public policy to require State Farm, Shaffer’s insurer, to pay punitive damages 
assessed against Torres. Citing Chapter 41 as establishing the basis and manner 
for assessing punitive damages, the court explained:
 
Exemplary damages are assessed to punish a wrongdoer and to 
serve as a deterrent to future wrongdoers. This policy does not support 
rendering damages against State Farm since neither 
deterrence of wrongful conduct nor punishment of Torres, the wrongdoer, 
is achieved by imposing exemplary damages upon Shaffer’s insurance carrier for 
Torres’ wrongful act.[68]
 
 
            
In the second category are two cases involving personal automobile 
insurance. Both concluded that punitive damages coverage is not against public 
policy. Dairyland County Mutual Insurance 
Co. v. Wallgren, decided in 1972, was the first 
case to consider whether punitive damages coverage is against Texas public policy.[69] The court concluded that a personal 
automobile policy’s coverage of “damages because of . . . bodily injury” 
included punitive damages and that the coverage could not be against public 
policy because it had been approved by the state regulatory agency.[70] As already explained, regulatory 
approval is certainly one factor to consider in determining public policy, 
although it may not be conclusive. A 1989 decision in Manriquez v. Mid-Century Insurance Co. held 
that a personal automobile policy covered punitive damages but did not discuss 
whether that was consistent with public policy.[71] Neither case considered whether 
insurance against punitive damages should be available when the sole purpose of 
such damages is punishment, as the Legislature has since determined.
            
In the third category are four cases, two of which involve commercial 
vehicle insurance. In Ridgway v. Gulf Life Insurance Co., a 1978 
diversity-jurisdiction case, the Fifth Circuit summarily affirmed a federal 
district court’s decision that punitive damages coverage is not against 
Texas public 
policy.[72] The district court relied entirely on 
Dairyland, discussed above, and Home 
Indemnity Co. v. Tyler[73] as stating Texas law.[74] In Home Indemnity, the court held 
that uninsured motorist coverage of punitive damages is not against public 
policy, but the same court has since overruled that case and followed the other 
courts that have reached the opposite conclusion.[75] Ridgway preceded Chapter 41 by 
nine years and did not consider whether punitive damages coverage is consistent 
with the purpose of punishment. In 1998, a federal district court in Hartford 
Casualty Insurance Co. v. Powell, another commercial vehicle insurance case, 
surveyed Texas law since Dairyland and Home Indemnity and concluded 
that Ridgway’s Erie-guess about Texas law “is clearly wrong when considered in context 
with the present Texas legal environment.”[76] Powell made its own 
Erie-guess that in most instances punitive damages coverage contravenes 
Texas public 
policy.
            
The other two cases in the third category involved general liability 
policies issued to corporate insureds. Both noted that 
the policy considerations regarding punitive damages coverage are different when 
the basis for the damages is the conduct of the insured’s employees or agents. 
American Home Assurance Co. v. Safway Steel 
Products Co. was a consolidation of two declaratory judgment actions, one 
involving an umbrella policy and the other an excess policy.[77] Punitive damages of $750,000 and $1 
million had been assessed against the insureds, 
respectively, in one case for gross negligence in failing to warn of the 
limitations of a football helmet the insured manufactured, and in the other case 
for gross negligence in the design and marketing of a scaffold.[78] The court observed that while allowing 
coverage of punitive damages would shift the burden of the punishment to 
“innocent” insurance purchasers,[79] thus thwarting the purpose of such 
damages, disallowing coverage for a large corporation would mean shifting the 
burden for the misconduct of a few employees to innocent consumers,[80] which is also contrary to the purpose 
for such damages. In the end, the court said, “[t]he question of how to ‘punish’ 
a corporation is a difficult one.”[81]
            
American Home was decided in late 1987, shortly after Chapter 41 
took effect. It did not refer to that statute and noted specifically that 
“[i]n Texas, juries are not allowed to consider the 
defendant’s wealth, resources, or insurance coverage when assessing compensatory 
or punitive damages.”[82] It was not until three months later that 
this Court held for the first that a defendant’s net worth is relevant in 
assessing punitive damages.[83] The only case to consider the current 
provisions of Chapter 41 in determining public policy regarding punitive damages 
coverage is DaimlerChrysler Insurance Co. v. Apple.[84] There, a car dealership’s inventory 
control manager claimed that his employer’s controller, general manager, and 
used car sales manager had defamed him. An arbitration panel agreed and assessed 
punitive damages of $500,000 against the dealership, $500,000 against its owner 
and CEO, and $50,000 each against the three employees, all of whom were 
determined to be vice-principals.[85] The district court confirmed the award 
of punitive damages against the dealership and two of the employees, and on 
appeal, the dealership settled with the plaintiff.[86] The dealership’s insurer under both a 
CGL policy and an umbrella policy refused coverage of the punitive damage 
awards, arguing in part that such coverage was against public policy.[87] The court rejected the argument in these 
circumstances but stressed that its decision was a limited one:
 
            
We express no opinion on whether, as a general rule, Texas policy 
disallows a party from insuring for exemplary damages. Our holding today is 
limited to the narrow circumstances before us, where a corporation is held 
liable for conduct by vice-principals; the conduct was done without the 
participation or knowledge of the CEO, officers or shareholders of the 
corporation; and the contract at issue covers “all sums” and is an arm’s-length 
transaction between an insurance company and a corporation that distinguishes 
between conduct done by employees and conduct done by the corporate entity, its 
CEO, its shareholders, and its officers. Thus, we cannot conclude that allowing 
the insurance coverage under these limited circumstances violates public policy 
to punish the wrongdoer.
 
            
Viewing the underlying facts concerning this agreement, we also cannot 
conclude that this agreement is contrary to the public good. Rather, the 
agreement here serves the public good because [the dealership], its CEO, its 
officers, and its shareholders did not commit the wrongful acts and should be 
allowed to have their insurance policy, for which they paid, indemnify them for 
the punitive damages, which were assessed against the corporation only due to 
conduct, of which its CEO, officers, and shareholders were not aware, done by 
its employees who held management positions. We hold that the agreement does not 
violate public policy.[88]
 
 
            
Outside the insurance context, it is worth noting that this Court has 
suggested that a person’s pre-injury waiver of another’s liability for gross 
negligence is against public policy while holding that a post-injury waiver is 
not.[89] And one court of appeals has held that 
an agreement to indemnify a person for his own gross negligence is not against 
public policy,[90] an issue on which this Court has 
expressed no opinion.[91]
            
In sum, recent Texas courts have uniformly held that uninsured or 
underinsured motorist coverage of punitive damages is against public policy, but 
in other contexts they have not had the opportunity, except in 
DaimlerChrysler, to take into account the importance of the purpose and 
manner of assessing punitive damages set out in Chapter 41. That case 
particularly, as well as the others, illustrates the important distinctions 
between punitive damages coverage for the gross negligence of the insured 
himself, the insured’s employees, and third parties.
F
            
Finally, though Texas’ public policy is its own, it is formed, not in a 
vacuum, but in awareness of the law of other American jurisdictions. That law 
is, of course, heavily influenced by the jurisdiction’s view of punitive 
damages. The cases defy easy categorization, but it appears that: 19 states 
generally permit coverage of punitive damages;[92] 8 states would permit coverage of 
punitive damages for grossly negligent conduct, but not for more serious 
conduct;[93] 11 states would permit coverage of 
punitive damages for vicariously-assessed liability, but not directly-assessed 
liability;[94] 7 states generally prohibit an insured 
from indemnifying himself against punitive damages;[95] and the remainder have silent, unclear, 
or otherwise inapplicable law.[96] States may fall into more than one 
category. 
III
            
I return now to the Circuit’s question. The case pending before that 
court involves a workers’ compensation policy that expressly provides coverage 
for punitive damages for the death of an employee caused by the 
employer-insured’s gross negligence. The policy is a standard form prescribed by 
the Commissioner of Insurance for workers’ compensation insurance in Texas. The 
action, as noted above, was preserved in the Texas Constitution at a time when 
punitive damages were often treated as compensatory, and is in the nature of a 
wrongful death action with a heightened burden of proof — gross negligence — and 
limited damages — punitive only. The purpose and manner of assessing punitive 
damages generally, now reflected in Chapter 41, has evolved apart from the 
constitutional action. And in many instances, employers will be corporations 
whose liability will be due to the conduct of other employees. For these 
reasons, I agree with the Court that the coverage does not contravene Texas 
public policy.
            
But the Circuit’s question is broader. The following considerations 
inform its answer in other insurance contexts:
 
•           
Contracts must be respected, and the right to contract freely should not be 
restricted without compelling reasons.
 
•           
Punitive damages may be assessed only as punishment and not for any other 
purpose, and thus they must be directed at the specific conduct of an individual 
defendant and must be based on his particular circumstances, including his net 
worth.
 
•           
Punitive damages coverage may pose an undesirable cost to insureds and to the public.
 
•           
Insurance is highly regulated, and the Commissioner of Insurance must have broad 
discretion to determine when punitive damages coverage may be 
offered.
 
 
            
For uninsured and underinsured motorist coverage, the consensus among the 
courts of appeals is that public policy prohibits extending the coverage to 
punitive damages. It is one thing for insurers’ policyholders to share in the 
burden of injury caused by an underinsured motorist and quite another to share 
in his punishment. Penalizing those who obtain the insurance required by law for 
those who do not simply cannot be justified.
            
The considerations weigh differently when the insured is a corporation or 
business that must pay punitive damages for the conduct of one or more 
employees. Although the conduct is attributable to the business, as it must be 
for liability for punitive damages, it will often be the case that stockholders, 
other employees, and even management as a larger group have done little to 
deserve punishment. Chapter 41 sets out the policy that punitive damages be 
directed against specific wrongdoing, but when such damages are assessed against 
an entire business for one employee’s wrongdoing, the punishment is at best 
indirect. While punitive damages are nevertheless imposed, a valid argument can 
be made that businesses should be permitted to insure against them, so that the 
burden is shared by others in like situations.
            
But even if public policy considerations do not preclude punitive damages 
coverage for the business, they counsel against extending that coverage to the 
wrongdoer himself. To insure an individual against punitive damages for his own 
gross negligence entirely defeats the punitive purpose of such damages and 
reduces the disincentive for misconduct. Even if the insured must pay higher 
premiums, which is not always the case, the punishment is so diluted that the 
purpose of punitive damages is seriously impaired. For example, the owner of a 
truck, aware that its brakes are malfunctioning, may be more likely to continue 
to use it, despite the grave risk to his employees and others, if his liability 
for punitive damages is covered by insurance and he perceives that the benefit 
to his business exceeds the cost of his insurance. In that situation, insurance 
encourages conduct punitive damages are intended to deter.
            
Taking into account the policy favoring freedom of contract, I would hold 
that when Chapter 41's punitive purpose would be significantly impaired, and a 
defendant’s net worth could not be meaningfully incorporated in the assessment, 
as Chapter 41 requires, insurance against punitive damages would violate Texas 
public policy unless these considerations are outweighed by other factors, such 
as expressions of legislative will, or regulatory approval of the coverage, or 
the attenuation of the burden of liability from the misconduct. In these 
situations, in my view, there is no formulaic answer to the public policy 
question. Chapter 41 provides for punishment of a person who knows full well 
that his conduct poses an extreme risk of harm to others and yet does not care. 
That, in essence, is gross negligence. The public policy analysis must answer 
why punitive damages for such egregious behavior should be avoided by 
insurance.
 
                                                                        
­­­­­­­­­­________________    
                                                                        
Nathan L. Hecht
                                                                        
Justice
 
 
Opinion delivered: February 15, 
2008









[1] 
See Tex. Const. art. V, § 
3-c(a) (“The supreme court and the court of criminal appeals have jurisdiction 
to answer questions of state law certified from a federal appellate court.”); 
Tex. R. App. P. 58 (prescribing 
procedures for certification of questions of law by federal appellate 
courts).

[2] 
Fairfield Ins. Co. v. Stephens Martin Paving, LP, 381 F.3d 435, 437 (5th 
Cir. 2004) (per curiam).

[3] 
Id.

[4] 
Gym-N-I Playgrounds, Inc. v. Snider, 220 S.W.3d 905, 912 (Tex. 2007) 
(commercial lease expressly waiving warranties) (quoting Wood Motor Co. v. 
Nebel, 238 S.W.2d 181, 185 (Tex. 1951) (construing 
contract termination clause) (quoting Printing & Numerical Registering 
Co. v. Sampson, 19 L.R.-Eq. 462, 465 (1875))); 
In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 130 n.11 (Tex. 2004) 
(contractual jury waiver) (quoting Wood Motor Co. and Sampson); 
BMG Direct Mktg., Inc. v. Peake, 178 S.W.3d 
763, 767 (Tex. 2005) (liquidated damages clause) (quoting Wood and 
Sampson); Missouri, Kan. & Tex. Ry. Co. of Tex. v. Carter, 68 
S.W. 159, 164 (Tex. 1902) (contract waiving responsibility for fires caused by 
railroad engines) (quoting Sampson).

[5] 
In re Prudential, 148 S.W.3d at 129 & n.11; see Sonny 
Arnold, Inc. v. Sentry Sav. Ass’n, 633 S.W.2d 811, 815 (Tex. 1982) (recognizing “the 
parties’ right to contract with regard to their property as they see fit, so 
long as the contract does not offend public policy and is not illegal”); 
Woolsey v. Panhandle Refining Co., 116 S.W.2d 675, 678 (Tex. 1938) (“In 
line with the universally accepted rule, this court has repeatedly refused to 
enforce contracts which are either expressly or impliedly prohibited by statutes 
or by public policy.”); Curlee v. 
Walker, 244 S.W. 497, 498 (Tex. 1922) (“The law recognizes the right of 
parties to contract with relation to property as they see fit, provided they do 
not contravene public policy and their contracts are not otherwise illegal.”); 
James v. Fulcrod, 5 Tex. 512, 520 (1851) (“That 
contracts against public policy are void and will not be carried into effect by 
courts of justice are principles of law too well established to require the 
support of authorities, and the only question is whether the agreement set forth 
in the petition be or not in violation of public policy or in fraud of the 
law.”); see generally Restatement 
(Second) of Contracts § 178 (1981).

[6] 
See, e.g., Hoover Slovacek LLP v. 
Walton, 206 S.W.3d 557, 559 (Tex. 2006) (termination fee agreement between 
lawyer and client); PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P’ship, 
146 S.W.3d 79, 82, 87 (Tex. 2004) (assignment of claims for violations of the 
Texas Deceptive Trade Practices–Consumer Protection Act); Johnson v. Brewer 
& Pritchard, P.C., 73 S.W.3d 193, 205 (Tex. 2002) (lawyer fee-sharing 
agreement); State Farm Fire & Cas. Co. v. 
Gandy, 925 S.W.2d 696, 698 (Tex. 1996) (defendant insured’s prejudgment 
assignment to plaintiff of claims against liability insurer); Zuniga v. Groce, Locke & Hebdon, 878 
S.W.2d 313, 314 (Tex. App.—San Antonio 1994, writ ref’d) (assignment of legal malpractice claims); Elbaor v. Smith, 845 S.W.2d 240, 241 (Tex. 
1992) (“Mary Carter” agreements, in which the defendant receives assignment of 
part of plaintiff's claim and both remain parties at trial); Desantis v. Wackenhut Corp., 793 S.W.2d 670, 
681 (Tex. 1990) (unreasonable non-compete agreement); Juliette Fowler Homes, 
Inc. v. Welch Assocs., Inc., 793 S.W.2d 660, 663 (Tex. 1990) (same); 
International Proteins Corp. v. Ralston-Purina Co., 744 S.W.2d 932, 934 
(Tex. 1988) (assignment of plaintiff’s claims against one tortfeasor to another tortfeasor); 
Hill v. Mobile Auto Trim, Inc., 725 S.W.2d 168 (Tex. 1987) (covenant not 
to compete in a “common calling”); Bergman v. Norris of Houston, 734 
S.W.2d 673 (Tex. 1987) (same); Trevino v. Turcotte, 564 S.W.2d 682, 690 (Tex. 1978) (assignment of 
right to challenge will to one who had elected to take under will); Crowell 
v. Housing Auth. of Dallas, 495 S.W.2d 887, 889 (Tex. 1973) (lease provision 
exempting authority from tort liability to tenants); Hooks v. 
Bridgewater, 229 S.W. 1114, 1118-1119 (Tex. 1921) (contract transferring 
custody of a child in exchange for permitting the child to inherit from the 
transferee); Barnhart v. Kan. City, Mex. & Orient Ry. Co., 184 S.W. 
176, 179 (1916) (contract in which employee assumes the risk of workplace 
injury); Texas Standard Oil Co. v. Adoue, 19 
S.W. 274 (Tex. 1892) (contract creating a combination to fix prices).

[7] 
See, e.g., National County Mut. Fire Ins. Co. v. 
Johnson, 879 S.W.2d 1, 2 (Tex. 1993) (family member exclusion in automobile 
liability policy); Puckett v. U.S. Fire Ins. Co., 678 S.W.2d 936, 938 
(Tex. 1984) (aviation policy excluding coverage based on lapse of airworthiness 
certificate even when lapse is causally unrelated to loss); Unigard Sec. Ins. Co. v. Schaefer, 572 S.W.2d 
303, 306 (Tex. 1978) (automobile liability policy endorsement excluding Personal 
Injury Protection coverage for one driver ); Jones v. Fid. & Guar. Ins. 
Co., 250 S.W.2d 281, 281-282 (Tex. Civ. App.—Waco 1952, writ ref’d) (policy covering innocent ex-wife for damages caused 
by ex-husband to their jointly-owned property), overruled by Kulubis v. Tex. Farm Bureau Underwriters Ins. 
Co., 706 S.W.2d 953, 955 (Tex. 1986); International Travelers’ Ass’n v. Branum, 212 S.W. 630 
(Tex. 1919) (policy provision prescribing venue ); Cheeves v. Anders, 28 S.W. 274, 275 (Tex. 
1894) (public policy does not allow one who lacks an insurable interest to own a 
policy on another’s life, but an insurer may be required to pay proceeds to 
proper parties, and, here, to reimburse an ex-partner for premiums paid by 
partners’ now-dissolved firm); Mayher v. 
Manhattan Life Ins. Co., 27 S.W. 124, 125 (Tex. 1894) (“It is against public 
policy for one man to become interested in the death of another when he has no 
interest in the continuance of life.”). Compare Burch v. Commonwealth 
County Mut. Ins. Co., 450 S.W.2d 838, 840-841 
(Tex. 1970) (public policy would preclude an insurance company from knowingly 
assuming a previously-occurring loss, but not when the loss was unknown to 
person arranging for the insurance, and there was no conscious or negligent 
failure to advise him of it); Hatch v. Turner, 193 S.W.2d 668, 669-670 
(Tex. 1946) (life insurance policy limiting benefits to premiums paid if covered 
person killed in military service in war was not against public policy); 
Equitable Life Assur. Soc’y v. Hazlewood, 12 S.W. 621, 624-625 (Tex. 1889) (insured’s 
brother, and insured himself, have an insurable interest in insured’s 
life).

[8] 
Lawrence v. CDB Servs., Inc., 44 S.W.3d 544, 
553 (Tex. 2001), superseded by statute, Act of June 17, 2001, 77th 
Leg., R.S., ch.1456, §§ 16.01, 17.01 & 17.02, 2001 Tex. Gen. Laws 5196, 
as explained in Villareal v. Steve's & Sons Doors, Inc., 139 
S.W.3d 352, 353-354 (Tex. App.–San Antonio 2004, no pet.) (new statute applied 
because employee was injured on July 21, 2001, after amendment’s June 17, 2001 
effective date).

[9] 
Singer Mfg. Co. v. Rios, 71 S.W. 275, 276 (Tex. 1903) (concluding that a 
sewing machine mortgage provision that allowed the mortgagee to repossess the 
property, which he did without violence, was not void as against public policy) 
(citation omitted).

[10] McElreath v. McElreath, 345 S.W.2d 722, 746 (Tex. 1961) (citations 
omitted); see Vidal v. Girard’s Ex’rs, 
43 U.S. (2 How.) 127, 197-198 (1844) (“The question, what is the public policy 
of a State, and what is contrary to it, if inquired into beyond [the limits of 
what its constitution, laws, and judicial decisions make known], will be found 
to be one of great vagueness and uncertainty, and to involve discussions which 
scarcely come within the range of judicial duty and functions, and upon which 
men may and will complexionally differ . . . .”); 
Town of Flower Mound v. Stafford Estates Ltd. P’ship, 135 S.W.3d 620, 628 (Tex. 2004) (“Generally, 
‘the State's public policy is reflected in its statutes.’” (quoting Texas 
Commerce Bank, N.A. v. Grizzle, 96 S.W.3d 240, 250 (Tex. 2002)); 
Lawrence, 44 S.W.3d at 553 (“Public policy, some courts have said, is a 
term of vague and uncertain meaning, which it pertains to the law-making power 
to define, and courts are apt to encroach upon the domain of that branch of the 
government if they characterize a transaction as invalid because it is contrary 
to public policy, unless the transaction contravenes some positive statute or 
some well-established rule of law.” (internal quotations and citation omitted)); 
Castillo v. Canales, 174 S.W.2d 251, 253 (Tex. 1943) (“The Legislature 
has the power to declare what shall be the policy of the State with reference to 
insurance matters.”); see generally Restatement (Second) of Contracts § 179 
(1981) (A public policy against the enforcement of promises or other terms may 
be derived by the court from (a) legislation relevant to such a policy, or (b) 
the need to protect some aspect of the public welfare . . . .”).

[11] State v. City of Austin, 331 S.W.2d 737, 741 (Tex. 1960) (”[S]tatutes and ordinances express the public policy of the 
state as it existed at the time of their adoption. Subject to constitutional 
limitations, however, that policy may be changed by the Legislature at any 
time.”).

[12] Black’s Law Dictionary 802 (7th ed. 
1999); see 1 Holme’s Appleman on 
Insurance 2d § 1.2, at 3-4 (1996) (At its core essence, risk is the 
Mother Mold of insurance.”); Couch on 
Insurance 3d § 1.9 (2005) (“The primary requisite essential to a contract 
of insurance is the assumption of a risk of loss and the undertaking to 
indemnify the insured against such loss.” (footnotes omitted)).

[13] Fortis Benefits v. Cantu, 234 S.W.3d 
642, 647 (Tex. 2007) (“an insurance policy's 
fundamental purpose . . . is to protect the insured by shifting the risk of loss 
to the insurer”); Insurance Co. of N. Am. v. Morris, 981 S.W.2d 667, 
(Tex. 1998) 
(risk-shifting and risk-pooling “are quintessential elements of insurance 
contracts”).

[14] See, e.g., National 
County 
Mut. Fire Ins. Co. v. 
Johnson, 879 S.W.2d 1, 2 (Tex. 1993) (family member exclusion in automobile 
liability policy was against public policy); Puckett v. U.S. Fire Ins. 
Co., 678 S.W.2d 936, 938 (Tex. 1984) (aviation policy excluding coverage 
based on lapse of airworthiness certificate even when lapse is causally 
unrelated to loss was against public policy); Unigard Sec. Ins. Co. v. Schaefer, 572 S.W.2d 
303, 306 (Tex. 1978) (automobile liability policy endorsement excluding Personal 
Injury Protection coverage for one driver was against public policy); Kulubis v. Tex. Farm Bureau Underwriters Ins. 
Co., 706 S.W.2d 953, 955 (Tex. 1986) (policy covering loss to innocent 
ex-spouse for damages to co-owned property was not against public 
policy).

[15] See, e.g., Burch v. 
Commonwealth 
County Mut. Ins. Co., 450 S.W.2d 838, 840-841 (Tex. 1970) 
(holding that a policy covering a known loss was against public policy); 
Jones v. Fid. & Guar. Ins. Co., 250 S.W.2d 281, 281-282 (Tex. Civ. 
App.—Waco 1952, writ ref’d) (policy covering innocent 
ex-wife for damages caused by ex-husband to their jointly-owned property was 
against public policy), overruled by Kulubis, 706 S.W.2d at 955.

[16] See, e.g., Hatch v. 
Turner, 193 S.W.2d 668, 669-670 (Tex. 1946) (holding that public policy did 
not prohibit, though it certainly did not require, a life insurance policy 
provision limiting benefits to premiums paid if covered person killed in 
military service in war).

[17] Equitable Life Assur. Soc’y v. Hazlewood, 12 
S.W. 621, 624 (Tex. 1889) (quoting Connecticut Mut. 
Life Ins. Co. v. Schaefer, 94 U.S. 457, 460 (1877)).

[18] See Stillwagoner v. Travelers Ins. Co., 979 S.W.2d 354, 360 (Tex. App.–Tyler 1998, no 
pet.).

[19] Kulubis, 706 S.W.2d at 
955.

[20] Id.

[21] Id.

[22] Texas Farmers Ins. Co. v. Murphy, 
996 S.W.2d 873, 880-881 (Tex. 1999).

[23] Burch v. Commonwealth County Mut. Ins. 
Co., 450 S.W.2d 838, 841 (Tex. 1970).

[24] Hofer v. Lavender, 679 S.W.2d 470, 
474 (Tex. 
1984) (“Of course, punishment of the wrongdoer is one purpose of exemplary 
damages. But, as recently as last year, we have stated that another of the 
purposes of such damages is to serve as an example to others. Pace v. 
State, 650 S.W.2d 64, 65 (Tex. 1983). We said the same thing in Sheffield 
Division, Armco Steel Corp. v. Jones, 376 S.W.2d 825, 831 (Tex. 1964). An 
earlier supreme court had concluded that exemplary damages also exist to 
reimburse for losses too remote to be considered as elements of strict 
compensation. Mayer v. Duke, 72 Tex. 445, 10 S.W. 565 (1889).”); City 
of Tyler v. Likes, 962 S.W.2d 489, 495 (Tex. 1997)(“For this reason, Texas 
courts at one time categorized mental anguish in most types of cases as too 
remote or speculative to be compensable as actual damages, holding the emotional 
consequences of the tort relevant only to exemplary damages. See 
Crawford v. Doggett, 82 Tex. 139, 17 S.W. 929, 930 (1891) (citing Traweek v. Martin-Brown Co., 79 Tex. 460, 14 
S.W. 564, 565-66 (1890)) . . . .”); Travelers Indem. Co. of Ill. v. Fuller, 892 S.W.2d 848, 852 n.5 
(Tex. 1995) (“The history of punitive damages also reveals that the early courts 
considered the remedy a part of the jury’s discretion to punish an offender who 
had injured the plaintiff in some aggravated fashion. The early judges gave the 
jury discretion to inflate a general damage award where the plaintiff’s 
injury, though comparatively small, was inflicted in a manner which the law 
sought to prevent.”).

[25] Act of June 3, 1987, 70th Leg., 1st C.S., 
ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 44.

[26] Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 17 (Tex. 1994).

[27] Act of April 11, 1995, 74th Leg., R.S., 
ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109.

[28] Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 13.02, 2003 Tex. Gen. Laws 847, 887.

[29] Tex. Civ. Prac. & Rem. Code § 
41.001(5).

[30] Act of June 3, 1987, 70th Leg., 1st C.S., 
ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 45 (enacting § 
41.002(a) to read: “This chapter applies to an action in which a claimant seeks 
exemplary damages relating to a cause of action as defined by Section 
33.001.”).

[31] Id. at 45 (enacting § 41.002(b) to 
read: “(b) This chapter does not apply to: (1) an action brought under the 
Deceptive Trade Practices-Consumer Protection Act (Subchapter E, Chapter 17, 
Business & Commerce Code); (2) an action brought under Chapter 21, Insurance 
Code; (3) an action brought under the workers’ compensation laws of this state 
(Article 8306 et seq., Revised Statutes); (4) an action to recover exemplary 
damages against an employer by the employee’s beneficiaries in a death action 
arising out of the course and scope of employment where the employer is a 
subscriber under the workers’ compensation laws of this state (Article 8306 et 
seq., Revised Statutes); (5) an action governed by Chapter 81, Civil Practice 
and Remedies Code; (6) an action brought under Chapter 246, Acts of the 63rd 
Legislature, Regular Session, 1973, Home Solicitation Transactions (Article 
5069-13.01 et seq., Vernon’s Texas Civil Statutes); (7) an action brought under 
Chapter 547, Acts of the 63rd Legislature, Regular Session, 1973, Debt 
Collection Practices (Article 5069-11.01 et seq., Vernon’s Texas Civil 
Statutes); (8) an action brought under Chapter 54, 91, or 92, Property Code; (9) 
an action brought under the Texas Manufactured Housing Standards Act (Article 
5221f, Vernon’s Texas Civil Statutes); (10) an action brought under the Texas 
Motor Vehicle Commission Code (Article 4413(36), Vernon’s Texas Civil Statutes); 
(11) an action brought under the Texas Proprietary School Act, Chapter 32, 
Education Code; (12) an action brought under Section 9.507 or Section 27.01, 
Business & Commerce Code; (13) an action brought under Chapter 36, Family 
Code; (14) an action brought under the Health Spa Act (Article 5221l, Vernon’s 
Texas Civil Statutes); (15) an action brought under the Business Opportunity Act 
(Article 5069-16.01 et seq., Vernon’s Texas Civil Statutes); or (16) an action 
brought under the Texas Timeshare Act (Article 6573c, Vernon’s Texas Civil 
Statutes).”).

[32] Act of April 11, 1995, 74th Leg., R.S., 
ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109-110. See also 
Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 4.01, 
1997 Tex. Gen. Laws 327, 328-329 (revising and amending § 41.002(b) to reflect 
1995 amendments).

[33] Tex. Bus. & Com. Code § 15.21 
(allowing injured persons and governmental entities to recover treble damages 
for willful or flagrant violations of the Act).

[34] Id. §§ 17.41-.63.

[35] See Id. § 17.50(b) and (g) 
(providing that Chapter 41, Civil Practice & Remedies Code, does not apply 
to actions under this subchapter).

[36] Chapter 21 has been repealed and its 
provision recodified. Act of May 22, 2003, 78th Leg., 
R.S., ch. 1274, 2003 Tex. Gen. Laws 3611.

[37] Tex. Hum. Res. Code §§ 36.001-.132 
(“Medicaid Fraud Prevention”); id. §§ 36.0011 (defining “culpable mental 
state”); 36.002(defining “unlawful acts”); 36.052 (allowing the state to 
recover, in addition to the payment or value of a benefit occasioned by an 
unlawful act, up to two times the amount of that payment or benefit, and, in 
some circumstances, other civil penalties); 36.101 (authorizing actions by 
private persons on behalf of themselves and the state); 36.110 (authorizing 
awards to private plaintiffs).

[38] Tex. Civ. Prac. & Rem. Code § 
41.005(a).

[39] Id. § 41.005(b).

[40] Id. § 41.005(c).

[41] 307 F.2d 432, 440-441 
(5th Cir. 1962).

[42] Tex. Civ. Prac. & Rem. Code § 
41.003(a), (c).

[43] Id. § 41.001(6).

[44] Id. § 41.001(7).

[45] Id. § 41.001(11).

[46] Id. § 41.003(c).

[47] Id. § 41.011(a).

[48] Id. § 41.001 (11).

[49] Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 31.01, 1977 Tex. Gen. Laws 2039, 2054-2056 
(adding former Tex. Ins. Code 
art. 5.15-1, sections 2(2) (defining “health care provider”) and 8 (stating “No 
policy of medical professional Insurance issued or renewed for a health care 
provider or physician in this state may include coverage for punitive damages 
that may be assessed against the health care provider.”).

[50] Id. § 1.02 (a)(5), at 2039- 2040.

[51] See House Study Group, Bill Analysis, C.S. 
H.B. 1048, 65th Leg., R.S., 5 (1977) (committee substitute) (“Exempting punitive 
damages from malpractice insurance coverage will help hold down 
premiums.”).

[52] The bill analyses for a 1997 amendment 
suggested that the prohibition applied only to policies issued in Texas. House Research Organization, Bill 
Analysis, Tex. H.B. 1170, 75th Leg., R.S., 1-2 (April 4, 1997) 
(“Currently, [not-for-profit nursing] homes must purchase insurance against 
punitive damages from out-of-state carriers, because only hospitals are 
currently allowed to do so in Texas. . . . [The amendment] would simply allow 
these homes to purchase insurance in Texas from a Texas regulated company.”); 
Sen. Research Ctr. [Sen. Economic Dev. 
Comm.] Bill Analysis, C.S.H.B. 1170, 75th Leg., R.S., 1 (May 6, 1997) 
(“Currently, the Insurance Code prohibits not-for-profit nursing homes from 
purchasing punitive damage insurance coverage under medical professional 
liability insurance from an admitted carrier. Not-for-profit nursing homes may 
purchase such insurance from non-admitted, out-of-state carriers.”).

[53] Act of June 3, 1987, 70th Leg., 1st C.S., 
ch. 1, § 7.01, 1987 Tex. Gen. Laws 1, 35-36 (allowing 
an endorsement for hospitals); Act of May 21, 1997, 75th Leg., R.S., ch. 746, § 1, 1997 Tex. Gen. Laws 2451, 2451 (allowing an 
endorsement for nonprofit nursing homes); Act of May 27, 2001, 77th Leg., R.S., 
ch. 1284,§ 5.02, 2001 Tex. Gen. Laws 3083, 3085 
(allowing an endorsement for for-profit nursing homes); Act of May 16, 2003, 
78th Leg., R.S., ch. 141, § 2, 2003 Tex. Gen. Laws 
195, 195 (allowing an endorsement for assisted living facilities).

[54] Tex. Ins. Code § 1901.252.

[55] Id. § 462.210 (excluding from the 
definition of “covered claims” against insolvent insurers under the Texas 
Property and Casualty Insurance Guaranty Act “any punitive, exemplary, extracontractual, or bad-faith damages awarded in a court 
judgment against an insured or insurer”); § 462.302(c) (“The [Texas Property and 
Casualty Insurance Guaranty Association] is not liable for . . . a claim for . . 
. exemplary damages . . . .”); § 463.204 (stating that the Life, Accident, 
Health, and Hospital Service Insurance Guaranty Association cannot pay punitive 
or exemplary damages); § 2203.154 (“The [Medical Liability Insurance Joint 
Underwriting Association] may not issue or renew a medical liability insurance 
policy for a physician or health care provider under this chapter that includes 
coverage for punitive damages assessed against the physician or health care 
provider.”); § 2205.253(b) (“Money in the [Texas Child-Care Facility Liability 
Fund] may not be used to pay . . . (1) punitive damages . . . .”); § 2207.353(c) 
(“Money in the [Excess Liability Fund for Counties and Certain Educational 
Entities] may not be used to pay . . . (1) punitive damages . . . .”); § 
2208.252(b) (“Money in the [Texas Public Entity Excess Insurance Fund] may not 
be used to pay: (1) punitive damages . . . .”); § 2208.303 (“Excess insurance 
coverage provided by the [Texas Public Entity Excess Insurance Pool] may not 
include coverage for punitive damages.”); § 2209.303 (“Liability insurance 
coverage provided by the [Texas Nonprofit Organizations Liability Pool] may not 
include coverage for punitive damages.”); § 2602.255(4) (excluding “exemplary, 
extracontractual, or bad faith damages awarded against 
an insured or title insurance company by a court judgment” from “covered claims” 
against the Texas Title Insurance Guaranty Association); § 2209.253(b) (“Money 
in the [Texas Nonprofit Organizations Liability Fund] may not be used to pay: 
(1) punitive damages . . . .”); § 2209.303 (“Liability insurance coverage 
provided by the [Texas Nonprofit Organizations Liability Pool] may not include 
coverage for punitive damages.”).

[56] Act of June 3, 1987, 70th Leg., 1st C.S., 
ch. 1, § 1.01, 1987 Tex. Gen. Laws 1, 4.

[57] Tex. Ins. Code § 38.154(a)(3)(C)(ix) 
(for claims over $25,000), §38.156(3)(B)(iv) (for claims over $10,000 but under 
$25,000). These reports are analyzed on the Department’s website at 
http://www.tdi.state.tx.us/reports/report5.html.

[58] The 1998 report showed that for over 5,000 
commercial liability claim settlements greater than $25,000, a third were 
influenced by either non-economic damages, exemplary 
damages, or prejudgment interest, and of the total paid on those claims, 9% was 
attributed to exemplary damages. For over 4,000 settlements between $10,000 and 
$25,000, 5% were influenced by exemplary damages, and of the total paid on those 
claims, 6% was attributed to exemplary damages. For cases tried to a verdict, 
11% of the amounts awarded were for punitive damages. Texas Dep’t of Ins., 1998 Texas Liability 
Insurance Closed Claim Report 2, 5-6, 17 (1998).
 
                
    The influence of exemplary damages on such settlements 
declined fairly steadily through 2005. The report for that year showed that for 
5,440 commercial liability claim settlements greater than $25,000, a fifth were 
influenced by non-economic damages, exemplary damages, or prejudgment interest, 
and of the total paid on those claims, 2% was attributed to exemplary damages. 
For settlements between $10,000 and $25,000, 0.15% were influenced by exemplary 
damages, and of the total paid on those claims, 2% was for exemplary damages. 
For cases tried to a verdict, 4% of the amounts awarded were for punitive 
damages. Texas Dep’t of Ins., 2005 Texas 
Liability Insurance Closed Claim Report 2, 5-6, 17 
(2005).

[59] For example, the Texas Tort Claims Act does 
not waive governmental immunity from punitive damages, Tex. Civ. Prac. & Rem. Code § 
101.024, but the Act does not apply to liability for proprietary functions. The 
State and its subdivisions, such as counties, do not engage in proprietary 
junctions, Bennett v. Brown County Water Improvement Dist. No. 1, 272 
S.W.2d 498 (Tex. 1954), but municipalities do, and when they do: “As a general 
rule a municipality may not be held liable for exemplary damages; however, if 
the plaintiff can show that there is intentional, willful, or grossly negligent 
conduct which shows an entire want of care to his rights and that such conduct 
can be imputed directly to the governing body of the municipality, exemplary 
damages may be recovered.” City of Gladewater v. Pike, 727 S.W.2d 514, 
522 (Tex. 1987). The Legislature may authorize punitive damages against the 
government, as it once did in the Whistleblower Act, Act of May 30, 1983, 68th 
Leg., R.S., ch. 832, § 4, 1983 Tex. Gen. Laws 4751, 
4752, before it changed its mind, Act of May 25, 1995, 74th Leg., R.S., ch. 721, § 3, 1995 Tex. Gen. Laws 3812, 3812 (codified at 
Tex. Gov’t Code § 554.003(a)). 
The government is not liable for punitive damages for employment discrimination. 
Tex. Lab. Code § 
21.2585.

[60] See, e.g., Tex Ins. Code § 2301.003(b) (“This 
subchapter applies to all lines of the following kinds of insurance written 
under an insurance policy or contract issued by an insurer authorized to engage 
in the business of insurance in this state: (1) general liability insurance; (2) 
residential and commercial property insurance, including farm and ranch 
insurance and farm and ranch owners insurance; (3) personal and commercial 
casualty insurance, except as provided by Section 2301.005; (4) medical 
professional liability insurance; (5) fidelity, guaranty and surety bonds other 
than criminal court appearance bonds; (6) personal umbrella insurance; (7) 
personal liability insurance; (8) guaranteed auto protection (GAP) insurance; 
(9) involuntary unemployment insurance; (10) financial guaranty insurance; (11) 
inland marine insurance; (12) rain insurance; (13) hail insurance on farm crops; 
(14) personal and commercial automobile insurance; (15) multi-peril insurance; 
and (16) identity theft insurance issued under Chapter.”); id. § 
2301.006(a) (“Except as provided by Section 2301.008, an insurer may not deliver 
or issue for delivery in this state a form for use in writing insurance 
described by Section 2301.003 unless the form has been filed with and approved 
by the commissioner.”); id.§ 2301.008 (“The commissioner may adopt 
standard insurance policy forms, printed endorsement forms, and related forms 
other than insurance policy forms and printed endorsement forms, that an insurer 
may use instead of the insurer's own forms in writing insurance subject to this 
subchapter.”).

[61] Tex 
Ins. Code § 2052.002(a) (“The commissioner shall prescribe standard 
policy forms and a uniform policy for workers’ compensation 
insurance.”).

[62] Dairyland County Mut. 
Ins. Co. v. Wallgren, 477 S.W.2d 341, 342 (Tex. 
Civ. App.–Fort Worth 1972, writ ref’d n.r.e.); Manriquez v. 
Mid-Century Ins. Co.,779 S.W.2d 482, 484-485 (Tex. App.–El Paso 1989, writ 
denied), disapproved in part on other grounds, Trinity Universal Ins. 
Co. v. Cowan, 945 S.W.2d 819, 822-824 (Tex. 1997).

[63] Milligan v. State Farm Mut. Auto. Ins. Co., 940 S.W.2d 228, 231-232 (Tex. 
App.–Houston [14th Dist.] 1997, writ denied), overruling Home Indem. Co. v. Tyler, 522 S.W.2d 594 (Tex. Civ. 
App.–Houston [14th Dist.] 1975, writ ref’d, n.r.e.); State Farm Mut. Auto. 
Ins. Co. v. Shaffer, 888 S.W.2d 146 (Tex. App.–Houston [1st Dist.] 1994, 
writ denied); Vanderlinden v. USAA Prop. and 
Cas. Ins. Co., 885 S.W.2d 239, 242 (Tex. 
App.–Texarkana 1994, writ denied); Government Employees Ins. Co. v. Lichte, 792 S.W.2d 546, 549 (Tex. App.–El Paso 1990), 
writ denied, 825 S.W.2d 431 (Tex. 1991) (per curiam).

[64] See, e.g., DaimlerChrysler Ins. 
Co. v. Apple, ___ S.W.3d ___ (Tex. App.–Houston [1st Dist.] 2007) (CGL and 
umbrella policies) (policies provided coverage for claims for "personal injury," 
which was defined to oral publication of libelous material, but excluded 
coverage for publication of material done by or at the direction of the insured 
with knowledge of its falsity); Westchester Fire Ins. Co. v. Admiral Ins. 
Co., 152 S.W.3d 172, 181-182, 185-190 (Tex. App.–Fort Worth, 2004, pet. 
pending) (for-profit nursing home) (insurer agreed to pay “those sums which the 
insured shall become legally obligated to pay as damages because of bodily 
injury to any person arising out of the rendering of or failure to render, 
during the policy period . . . professional services” including nursing care); 
American Home Assur. v. Safway Steel Prods. Co., 743 S.W.2d 693, 701-702 (Tex. 
App.–Austin 1987, writ denied) (umbrella policy); Ridgway v. Gulf Life Ins. 
Co., 578 F.2d 1026, 1029 (5th Cir. 1978) (commercial vehicle 
policy).

[65] Tex. Lab. Code § 408.001(a) (“Recovery 
of workers’ compensation benefits is the exclusive remedy of an employee covered 
by workers’ compensation insurance coverage or a legal beneficiary against the 
employer or an agent or employee of the employer for the death of or a 
work-related injury sustained by the employee.”).

[66] Tex. Const. art. XVI, § 26 (“Every 
person, corporation, or company, that may commit a homicide, through wilful act, or omission, or gross neglect, shall be 
responsible, in exemplary damages, to the surviving husband, widow, heirs of his 
or her body, or such of them as there may be, without regard to any criminal 
proceeding that may or may not be had in relation to the homicide.”). The action 
is correspondingly recognized by the Workers’ Compensation Act. Tex. Lab. Code § 408.001(b) (“This 
section [providing an exclusive remedy for injured employees] does not prohibit 
the recovery of exemplary damages by the surviving spouse or heirs of the body 
of a deceased employee whose death was caused by an intentional act or omission 
of the employer or by the employer's gross negligence.”).

[67] See sources cited, supra note 
63.

[68] Shaffer, 888 S.W.2d at 149 
(citations omitted).

[69] 477 S.W.2d 341 (Tex. Civ. App.–Fort Worth 
1972, writ ref’d n.r.e.).

[70] Id. at 342-343.

[71] 779 S.W.2d 482, 484-485 (Tex. App.—El Paso 
1989, writ denied), disapproved in part on other grounds, Trinity 
Universal Ins. Co. v. Cowan, 945 S.W.2d 819 (Tex. 1997).

[72] 578 F.2d 1026, 1029 (5th Cir. 
1978).

[73] Home Indemnity Co. v. Tyler, 522 S.W.2d 594 
(Tex. Civ. App.–Houston [14th Dist.] 1975, writ ref’d, 
n.r.e.), overruled by Milligan v. State Farm 
Mut. Auto. Ins. Co., 940 S.W.2d 228, 232 (Tex. 
App.–Houston [14th Dist.] 1997, writ denied).

[74] Ridgeway, 578 F.2d 
at 1029-1030.

[75] Milligan , 
940 S.W.2d at 232.

[76] 19 F. Supp. 2d 678, 696 (N.D. Tex. 1998).

[77] 743 S.W.2d 693, 695-696 (Tex. App.–Austin 
1987, writ denied).

[78] Id. at 695.

[79] Id. at 704.

[80] Id.

[81] Id.

[82] Id. (italics omitted).

[83] Lunsford v. Morris, 746 S.W.2d 471, 
473 (Tex. 
1988).

[84] ___ S.W.3d ___ (Tex. App.–Houston [1st 
Dist.] 2007) (cause no. 01-05-01115-CV) (pending on motion for 
rehearing).

[85] Id. at ___ & n.4; see 
also Hammerly Oaks, Inc. v. Edwards, 
958 S.W.2d 387, 391 (Tex. 1997) (stating that “the general rule in Texas” is set 
out in Restatement of Torts § 909 
(1939): “Punitive damages can properly be awarded against a master or other 
principal because of an act by an agent if, but only if, (a) the principal 
authorized the doing and the manner of the act, or (b) the agent was unfit and 
the principal was reckless in employing him, or (c) the agent was employed in a 
managerial capacity and was acting in the scope of employment, or (d) the 
employer or a manager of the employer ratified or approved the act.”).

[86] DaimlerChrysler v. Apple, ___ at 
___.

[87] Id.

[88] Id. at ___ (citations 
omitted).

[89] Memorial Med. Ctr. of E. Tex. v. Keszler, 943 S.W.2d 
433, 435 (Tex. 
1997) (per curiam) (“The court of appeals held that 
such a release is against public policy [citing Smith v. Golden Triangle 
Raceway, 708 S.W.2d 574, 576 (Tex. App.–Beaumont 1986, no writ)]. However, 
the court of appeals failed to distinguish a pre-accident waiver of liability 
from a post-injury release made in settlement of claims. In Golden 
Triangle, the issue was whether a pre-injury release could effectively 
dispense with a claim of gross negligence. The court found a pre-injury release 
of gross negligence invalid as against public policy. [Golden Triangle, 
708 S.W.2d at 576.] We have never held post-injury releases of gross negligence 
claims invalid. There is no logic in prohibiting people from settling existing 
claims. Significantly, such a rule would preclude settlement of many such 
claims. The court of appeals erred in holding that [the plaintiff] could not 
release his gross negligence claim against [the defendant].”(citations 
omitted)).

[90] Webb v. Lawson-Avila Constr., Inc., 
911 S.W.2d 457, 461-462 (Tex. App.–San Antonio 1995, writ dism’d w.o.j.) (“Appellants argue 
that indemnity for one’s own gross negligence, in a non-insurance context, is 
violative of public policy. . . . [T]here is nothing 
in the record or in the law which would allow us to ignore [an indemnity 
provision’s] plain meaning. The record reveals nothing other than an arm’s 
length transaction between two business entities, and we must fairly and 
reasonably interpret the contract. . . . [Whether the provision is against 
public policy] is a matter better left to the Legislature or the ruling of our 
Supreme Court.”).

[91] Atlantic Richfield Co. v. Petrol. Pers., 
Inc., 768 S.W.2d 724, 726 n.2 (Tex. 1989) (“We do not decide whether 
indemnity for one’s own gross negligence or intentional injury may be contracted 
for or awarded by Texas courts. This issue is not presented in this 
[case].”).

[92] Alabama, Alaska, Arizona, Delaware, 
Georgia, Hawaii, Idaho, Maryland, Mississippi, Montana, New Hampshire, New 
Mexico, North Carolina, South Carolina, Tennessee, Vermont, Washington, 
Wisconsin, and Wyoming.

[93] Arkansas, 
Kentucky, Iowa, Louisiana, 
Nevada, Oregon, Virginia, and 
West 
Virginia.

[94] California, Connecticut, 
Florida, Illinois, Indiana, 
Kansas, Kentucky, Minnesota, 
New Jersey, Oklahoma, and Pennsylvania.

[95] Colorado, 
New York, North 
Dakota, Ohio, Rhode Island, South 
Dakota, and Utah.

[96] Maine, 
Massachusetts, Michigan, Missouri, and 
Nebraska.